1
 2026 CO 51 Jason P. Brown, Petitioner v. The People of the State of Colorado, Respondent No. 24SC492Supreme Court of Colorado, En BancJune 23, 2026

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 21CA405.

 Attorneys for Petitioner: Megan A. Ring, Public Defender
Emily Hessler, Deputy Public Defender.

 Attorneys for Respondent: Philip J. Weiser, Attorney General
Austin R. Johnston, Assistant Attorney General Brian M.
 Lanni, Senior Assistant Attorney General.

 Attorneys for Amicus Curiae Colorado District Attorneys'
 Council: Jeff M. Van der Veer, Senior Deputy District
 Attorney Thomas Raynes

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE BERKENKOTTER, and JUSTICE BLANCO joined. JUSTICE
 SAMOUR concurred in part and concurred in the judgment only
 in part.

 OPINION

 GABRIEL, JUSTICE.

 ¶1
We granted certiorari to consider two issues: (1) whether
 People v. Manzo, 144 P.3d 551 (Colo. 2006), is no
 longer good law or is distinguishable, and whether the trial
 court reversibly erred and violated Jason P. Brown's
 right to due process because it allowed the jury to convict
 him of a class 3 felony for leaving the scene of an accident
 resulting in death ("LTS (death)") without the
 prosecution proving that he acted with any culpable mental
 state; and (2) whether Colorado's prior habitual offender
 scheme is unconstitutional because it required a judge rather
 than a jury to make findings of fact that increase a
 defendant's sentence, and whether Brown's
 adjudication as a habitual offender must be vacated because
 he was deprived of his right to a jury trial.

 ¶2
We now conclude that (1) Manzo remains good law, and
 therefore, the trial court did not err or violate Brown's
 right to due process in entering judgment for LTS (death) and
 leaving the scene of an accident resulting in serious bodily
 injury ("LTS (SBI)") against Brown without
 requiring the prosecution to prove that he acted with any
 culpable mental state; and (2) the prior Colorado habitual
 offender scheme was constitutional, and any error in
 Brown's adjudication as a habitual offender was harmless
 beyond a reasonable doubt. (We note that the first issue on
 which Brown sought certiorari was framed as addressing only
 LTS (death), but the substantive arguments that he presented
 in his briefs apply equally to LTS (death)

 and LTS (SBI). Because, like him, we perceive no reason to
 treat those offenses differently for purposes of the first
 issue presented, we address both of those offenses in this
 opinion.)

 ¶3
 Accordingly, we affirm the judgment of the court of appeals
 division below.

 I.
Facts and Procedural History

 ¶4
 One night in June 2017, Brown turned his truck into an alley
 and drove over two people who were sleeping under a white
 blanket in an alcove there. He slowed down, and a witness
 told him through an open window on the truck that he
"just ran those people over." He responded,
 "No, I didn't," and sped off while the witness
 ran after him, trying to get his license plate number.

 ¶5
 One of the victims, D.W., survived, although he sustained
 serious injuries requiring emergency surgical intervention.
The other victim, K.M., died that night as a result of her
 injuries.

 ¶6
 Shortly thereafter, law enforcement officers, who were able
 to determine Brown's home address from the information
 provided by witnesses, met with Brown at his home. The
 officers observed that Brown had bloodshot, watery eyes and
 smelled of alcohol, although Brown told the officers that he
 did not drink until he arrived home. Later that evening, the
 witness who had told Brown that he had run over the victims
 identified him as the person who had done so.

 ¶7
The People subsequently charged Brown with, among other
 things, LTS (death) and LTS (SBI), pursuant to section
 42-4-1601, C.R.S. (2025). Brown pleaded not guilty to those
 charges.

 ¶8
 In addition, after filing their initial complaint against
 Brown, the People filed a motion to amend the complaint to
 add habitual criminal counts under section 18-1.3-801, C.R.S.
 (2017). In response, Brown filed a motion to declare the
 habitual criminal statute unconstitutional on its face and as
 applied to him. He also filed a motion demanding a jury trial
 on the habitual criminal counts.

 ¶9
The trial court ultimately granted the People's motion to
 amend to add the habitual criminal counts and denied
 Brown's responsive motions.

 ¶10
The case proceeded to trial, and at trial, the court
 instructed the jury as to the elements of LTS (death), in
 pertinent part, as follows:

The elements of the crime of Failure to Fulfill Duties after
 Involvement in an Accident Involving Death are:

1. That the defendant,

2. in the state of Colorado, at or about the date and place
 charged,

3. drove a vehicle that was directly involved in an accident,

4. resulting in the death of any person, and

5. failed to do the following, without obstructing traffic
 more than necessary: immediately stop his vehicle at the
 scene of the accident, or as close to the accident scene as
 possible, and immediately return to the scene of the accident
 and remain at the scene of the accident until he had
 fulfilled the legal requirements of giving notice,
 information, and aid.

 After
 considering all the evidence, if you decide the prosecution
 has proven each of the elements beyond a reasonable doubt,
 you should find the defendant guilty of Failure to Fulfill
 Duties after Involvement in an Accident Involving Death.

 ¶11
The court instructed the jury on the elements of LTS (SBI) in
 virtually identical language, with the only difference being
 the instruction's reference to serious bodily injury
 rather than death. Neither of these elemental instructions
 included any culpable mental state.

 ¶12
 The jury ultimately convicted Brown of both LTS charges, and
 the trial court thereafter adjudicated Brown a habitual
 offender without submitting questions of fact as to the
 habitual criminal counts to the jury. The court then
 sentenced Brown to a total of sixty years in the Department
 of Corrections.

 ¶13
 Brown appealed both his LTS convictions and his habitual
 criminal sentence.

 ¶14
 As to the LTS convictions, Brown argued that the trial court
 had erred by not including any culpable mental state in the
 elemental instructions regarding those counts, thereby
 effectively instructing the jury that the LTS crimes were
 strict liability offenses. Brown acknowledged that we had
 concluded in Manzo that LTS crimes were strict
 liability offenses that did not require a culpable mental
 state, but he contended that this determination was erroneous
 in light of the Supreme Court's subsequent ruling in
 Rehaif v. United States, 588 U.S. 225 (2019).

 ¶15
 As to the habitual criminal sentence, Brown argued that the
 trial judge's finding that Brown was a habitual offender
 must be vacated because the then-existing habitual offender
 scheme was facially unconstitutional under both the United
 States and Colorado Constitutions, given that it permitted a
 judge rather than a jury to make predicate findings of fact.

 ¶16
 In a unanimous, unpublished opinion, a division of our court
 of appeals affirmed the LTS convictions and habitual offender
 sentence. People v. Brown, No. 21CA405, ¶¶
 100-01, 105-07 (May 9, 2024).

 ¶17
 With regard to Brown's challenge to the LTS instructions,
 the division concluded that it was bound to follow
 Manzo. Id. at ¶¶ 96-100. Even if
 Rehaif could be said to have effectively overruled
 Manzo, however, the division concluded that any
 error in the omission of the knowingly mental state from the
 elemental instructions was harmless beyond a reasonable doubt
 because the record established that element through
 substantial evidence, including the visibility of the white
 blanket in the alley, Brown's pausing after running over
 the victims, and his speeding away after being confronted by
 witnesses. Id. at ¶ 100.

 ¶18
 With regard to Brown's constitutional challenge to the
 habitual offender statute, the division concluded that
 Brown's position was foreclosed by this court's
 precedent and settled case law from other divisions of the
 court of appeals. Id. at ¶¶ 106-07.

 ¶19
 Brown then petitioned this court for certiorari review, and
 we granted his petition.

 II.
Analysis

 ¶20
We begin by addressing the applicable standard of review. We
 then consider whether Manzo remains good law and is
 applicable to this case. Finally, we address whether the
 prior habitual offender scheme was facially unconstitutional
 and if Brown's adjudication by the trial court as a
 habitual offender must be vacated.

 A.
Standard of Review

 ¶21
We review jury instructions de novo to determine whether they
 accurately informed the jury of the governing law.
Roberts v. People, 2017 CO 76, ¶ 18, 399 P.3d
 702, 705.

 ¶22
We likewise review a statute's constitutionality, both
 facially and as applied, de novo. See Dean v.
 People, 2016 CO 14, ¶ 8, 366 P.3d 593, 596.

 ¶23
We review trial errors of constitutional dimension that were
 preserved, like those at issue here, for constitutional
 harmless error. Hagos v. People, 2012 CO 63, ¶
 11, 288 P.3d 116, 119. Such errors require reversal unless
 they were harmless beyond a reasonable doubt. Id.
Accordingly, we will reverse if there is a reasonable
 possibility that such an error might have contributed to the
 conviction.

Id. For this type of error, the People bear the
 burden of proving that the error was harmless beyond a
 reasonable doubt. Id.

 B.
The LTS Jury Instructions

 ¶24
 Brown first contends that Manzo is no longer good
 law or is distinguishable and therefore, the trial court
 reversibly erred in entering judgment on the LTS (death) and
 LTS (SBI) counts without proof of a culpable mental state
 (here, "knowingly"). We are not persuaded.

 ¶25
We begin, as we must, with settled principles of stare
 decisis.

 ¶26
"Stare decisis is a judge-made doctrine that requires
 courts to follow preexisting rules of law." Love v.
 Klosky, 2018 CO 20, ¶ 14, 413 P.3d 1267, 1270.
Although courts are hesitant to undo settled law, they may
 depart from or overrule prior precedent when sound reasons
 exist to do so. Id. at ¶¶ 14-15, 413 P.3d
 at 1270. Specifically, we will depart from our existing law
 when we are clearly convinced that "(1) the rule was
 originally erroneous or is no longer sound because of
 changing conditions and (2) more good than harm will come
 from departing from precedent." Id. at ¶
 15, 413 P.3d at 1270.

 ¶27
 Here, Brown contends that subsequent events have shown that
 Manzo is no longer good law. In particular, he
 asserts that the Supreme Court's ruling in
 Rehaif effectively overruled Manzo and
 that, in any event, the increased penalties for

 LTS (death) and LTS (SBI) that were adopted after
 Manzo was decided rendered our decision in that case
 inapplicable. We disagree.

 ¶28
 In Rehaif, 588 U.S. at 227, the Supreme Court
 considered a federal statute that made it unlawful for
 certain categories of individuals to possess firearms. A
 separate statute added that anyone who "knowingly
 violates" the first statute shall be fined or imprisoned
 for up to ten years. Id. (quoting 18 U.S.C. §
 924(a)(2)). The question presented required the Court to
 decide whether the government had the burden of proving both
 that the defendant engaged in the relevant conduct (i.e.,
 possession of a firearm) and that the defendant fell within
 one of the categories of individuals to whom the statute was
 directed. Id. The Court concluded that the word
 "knowingly" applied "both to the
 defendant's conduct and to the defendant's
 status." Id.

 ¶29
 In so concluding, the Court began by noting that whether a
 statute requires the government to prove that the defendant
 had acted knowingly is a question of legislative intent.
Id. at 228. To determine this intent, the Court
 observed that courts apply a longstanding presumption that
 Congress intends to require a defendant to have a culpable
 mental state as to each statutory element. Id. at
 228-29. This presumption in favor of scienter applies, the
 Court said, even when Congress does not include any scienter
 in the statutory text. Id. at 229. And the court
 added that the presumption applies with equal or greater
 force when the

 statute at issue includes a general scienter provision.
Id. (citing Model Penal Code § 2.02(4), at 226
(A.L.I. 1985) for the proposition that when a statute
 prescribes a requisite culpability, without distinguishing
 among the material elements of that statute, the culpability
 provision will apply to all material elements of the offense
 unless a contrary purpose plainly appears). The Court noted,
 however, that it has "typically declined to
 apply the presumption in favor of scienter in cases involving
 statutory provisions that form part of a 'regulatory'
 or 'public welfare' program and carry only minor
 penalties." Id. at 232 (emphasis added).

 ¶30
 For several reasons, we reject Brown's premise that the
 foregoing language in Rehaif effectively overruled
 Manzo.

 ¶31
 First, as noted above, Rehaif concerned a statutory
 scheme that explicitly included a "knowingly"
 mental state. Id. at 227. The question before the
 Court involved the elements to which that mens rea applied.
Id. The opinion thus has no bearing on a statute
 like the one at issue here that has no express mens rea
 requirement and thus tasks us with determining whether to
 imply such an element.

 ¶32
 Second, although the Rehaif Court made comments
 about the presumption of scienter "typically" not
 applying to public welfare offenses and offenses carrying
 only minor penalties, in light of the foregoing, those
 comments were

 dicta, as they had no direct bearing on the statute that the
 Court was construing, which did include a culpable
 mental state.

 ¶33
 Third, the Rehaif Court's comments on these
 issues did not establish immutable principles of black letter
 law. As noted above, the Court prefaced the comments on which
 Brown relies with the word "typically,"
id. at 232, thus signaling that the principle on
 which the Court was commenting was a general one, and not one
 of uniform application.

 ¶34
 Finally, even if the comments in Rehaif on which
 Brown relies were not dicta, we perceive nothing in
 Rehaif purporting to make the severity of an
 offense's penalty a sole determinant of whether a crime
 may be a strict liability offense. To the contrary,
 Rehaif relied on long-settled principles suggesting
 that the nature of an offense and the severity of its penalty
 may be considered in determining whether a crime may properly
 be construed to be a strict liability offense. See
id. We see nothing in Rehaif suggesting an
 intent to depart from or alter that long-established law.

 ¶35
 For all of these reasons, we discern nothing in
 Rehaif that can be read as effectively overruling
 Manzo.

 ¶36
 Our conclusion that Manzo remains good law finds
 further support in the applicable statutory and legislative
 history of section 42-4-1601. Specifically, we note that in
 the many years since Manzo was decided, the General
 Assembly has

 amended that statute four times and, among other things,
 increased the penalties for LTS (death) and LTS (SBI).
See Ch. 225, sec. 1, § 42-4-1601(2)(c), 2008
 Colo. Sess. Laws 850, 850 (elevating LTS (death) from a class
 4 to a class 3 felony); Ch. 261, sec. 1, §
 42-4-1601(2)(b), 2012 Colo. Sess. Laws 1354, 1354 (elevating
 LTS (SBI) from a class 5 to a class 4 felony); Ch. 337, sec.
 2, § 42-4-1601(3), 2017 Colo. Sess. Laws 1797, 1803
(providing that the revocation of a person's driver's
 license due to an LTS conviction runs concurrently with any
 suspension imposed pursuant to section 42-2-127.9, C.R.S.
 (2025), if imposed as a result of the same driving episode);
Ch. 331, sec. 3, § 42-4-1601(4), 2019 Colo. Sess. Laws
 3070, 3072 (modifying the sections to which certain
 definitions apply).

 ¶37
 Despite these several amendments, the General Assembly has
 never indicated an intent to overrule Manzo or to
 add a mens rea requirement to section 42-4-1601. To the
 contrary, the General Assembly appears to have acted to
 ensure that drivers involved in accidents resulting in death
 or serious bodily injury will remain at the scene of an
 accident or otherwise face strict liability charges. Thus,
 the legislative history reveals the General Assembly's
 intent to place LTS (death) and LTS (SBI) on equal footing
 with driving under the influence ("DUI") vehicular
 homicide and assault, both of which are strict liability
 offenses that carry a higher felony classification level than
 that which was prescribed for LTS before 2008. In doing so,
 the General Assembly sought to eliminate any incentive for
 intoxicated

 drivers to flee the scene so that they would face a lesser
 penalty than they would have faced had they remained and been
 found to be intoxicated. See, e.g., Hearing on S.B.
 239 before the S. Judiciary Comm., 66th Gen. Assemb., 2d
 Sess. (Apr. 23, 2008) (statement of now-Judge Ted Tow, then a
 representative from the Colorado District Attorneys'
 Council) ("[LTS (death)] currently [is] a class 4
 felony. The problem is if [an intoxicated driver] stick[s]
 around and they find out they're drunk, it's a class
 3 felony. So, there's an incentive for someone to flee
 the scene, and that doesn't seem to make a lot of
 sense."); Second Reading of S.B. 239 before the Senate,
 66th Gen. Assemb., 2d Sess. (Apr. 28, 2008) (statement of
 bill sponsor Sen. Bob Bacon) (noting that the bill's goal
 is to increase the penalty for an accident that results in
 death because, under then-existing law, if an individual
 flees the accident, that individual "is subject to a
 level 4 [felony], and one who stays there and has an
 aggravating factor like a DUI then gets the more severe
 penalty"; and further noting that "what this does
 is to make sure that the person stays there . . . if a death
 is involved"); Hearing on S.B. 239 before the H.
 Judiciary Comm., 66th Gen. Assemb., 2d Sess. (Apr. 30, 2008)
(statement of now-Judge Ted Tow) (noting that under
 then-existing law, an individual's flight has forced the
 People into a position where they can prove only a low-level
 crime involving death, and thus, "what this bill will do
 is essentially put the individual at the same level as if he
 had committed the worst of these [vehicular crimes resulting
 in death]," in order

 to disincentivize flight and allow the People to determine
 the correct level of the individual's culpability and to
 bring appropriate charges); Hearing on H.B. 1084 before the
 H. Judiciary Comm., 68th Gen. Assemb., 2d Sess. (Feb. 16,
 2012) (statement of bill sponsor Rep. Kathleen Conti) (noting
 that under then-existing law, persons involved in
 alcohol-involved hit-and-run accidents resulting in serious
 bodily injury were incentivized to run home and sober up
 before coming back and admitting to the accident, at which
 point they faced a lesser charge, thus resulting in a
 "miscarriage of justice that we are seeing . . . right
 now in the law and a loophole that we feel needs to be
 repaired, and that's . . . the basis of this bill [which
 increased the penalty for such hit-and-run accidents]").

 ¶38
 In light of the absence of any reference to a culpable mental
 state or disapproval of Manzo in the foregoing
 statutory and legislative history, we presume that the
 legislature accepted our conclusion in Manzo that
 LTS offenses are strict liability offenses. See Griego v.
 People, 19 P.3d 1, 5 (Colo. 2001) ("We must presume
 that, when the General Assembly legislates in a certain area
 of law, it does so with awareness of the judicial precedent
 in that area."); People v. Swain, 959 P.2d 426,
 430-31 (Colo. 1998) ("Under an established rule of
 statutory construction, the legislature is presumed, by
 virtue of its action in amending a previously construed
 statute without changing the portion that was construed, to
 have accepted and ratified the prior judicial
 construction."). Ruling now that

 LTS (death) and LTS (SBI) include a mens rea of
 "knowingly," as Brown asks us to do, would
 incentivize drivers to flee the scene of an accident,
 contrary to the General Assembly's expressed intent.

 ¶39
 Finally, although Brown contends that Manzo is
 inapplicable because LTS (death) is now a class 3 felony,
 whereas Manzo involved LTS (SBI) when it was still
 categorized as a class 5 felony, this argument merely
 reiterates Brown's suggestion that under Rehaif,
 the severity of a sentence is essentially dispositive of
 whether an offense may be construed to be a strict liability
 offense. Again, however, we are unpersuaded by this
 contention. Moreover, Rehaif, 588 U.S. at 228,
 itself observed that whether a culpable mental state applies
 to a criminal statute "is a question of congressional
 intent." For the reasons discussed above, we perceive
 nothing in the statute requiring a culpable mental state and
 nothing in the legislative history suggesting an intent to
 adopt such an element.

 ¶40
 Accordingly, we conclude that Manzo remains good law
 and that therefore, the trial court did not err in entering
 judgment against Brown for LTS (death) and LTS (SBI) without
 a jury finding on culpability.

 ¶41
 In so concluding, we are not persuaded by Brown's
 contention that in enacting section 42-4-1601, the
 legislature intended for drivers to have, at the very least,
 knowledge of their involvement in an accident because without
 such knowledge, a driver would be unaware of their duty to
 remain at the scene.

Although we are not unsympathetic to this argument and
 acknowledge that some states with LTS statutes similar to
 ours have concluded that knowledge is required as to the
 accident element of the offense, see, e.g.,
 State v. Al-Naseer, 734 N.W.2d 679, 680-81
(Minn. 2007); Clancy v. State, 313 P.3d 226, 230
(Nev. 2013), we are constrained to follow the plain language
 of our own section 42-4-1601 and to effectuate our
 legislature's intent. Any effort to remedy perceived
 inequity that might result from the application of the
 statute's plain language is more appropriately directed
 to our General Assembly.

 ¶42
 Moreover, requiring knowledge only as to the accident element
 of the offenses before us (i.e., concluding that a defendant
 must know of the accident but not of the resulting death or
 injury) would be inconsistent with the settled principle that
 the level of culpability generally applies to all
 elements of an offense unless the statute clearly indicates
 otherwise. See § 18-1-503(4), C.R.S. (2025)
("When a statute defining an offense prescribes as an
 element thereof a specified culpable mental state, that
 mental state is deemed to apply to every element of the
 offense unless an intent to limit its application clearly
 appears."); People v. Coleby, 34 P.3d 422, 424
(Colo. 2001) (applying section 18-1-503(4) to conclude that
 the mens rea of "knowingly" applied to all elements
 of the offense at issue, even though that mens rea appeared
 in only one part of the statute, when the legislative history
 revealed no intent on the part of the General Assembly to
 limit the

 application of the culpable mental state to just one element
 of the offense); People v. Trevino, 826 P.2d 399,
 402 (Colo.App. 1991) ("If a statute defining an offense
 contains a specific mens rea requirement, that
 mental state is deemed to apply to every element of the
 offense," and this same rule applies when the statute
 merely implies a mens rea.). We perceive no basis for
 applying an implied mens rea to only certain elements of the
 offenses at issue when, as here, neither the statutory text
 nor its statutory and legislative history supports our doing
 so.

 ¶43
 Lastly, we are unpersuaded by Brown's assertion that
 allowing a judgment of conviction for LTS (death) and LTS
 (SBI) without a jury finding of knowledge of involvement in
 an accident violates due process. In making this argument,
 Brown essentially reiterates his view that Rehaif
 mandates such a result and effectively overruled
 Manzo. For the reasons set forth above, we do not
 agree.

 ¶44
 Accordingly, we conclude that Manzo remains good law
 and that therefore, the trial court did not err in entering
 judgment against Brown for LTS (death) and LTS (SBI) without
 a jury finding of any culpable mental state attributable to
 him.

 C.
The Habitual Offender Statute

 ¶45
 Brown next contends that the prior version of Colorado's
 habitual offender scheme, sections 18-1.3-801 to -804, C.R.S.
 (2017), under which the trial court found Brown to be a
 habitual offender, is facially unconstitutional because it
 purports to mandate that a judge rather than a jury make the
 requisite fact-finding. Brown

 further contends that his adjudication as a habitual offender
 must be vacated because he was deprived of his right to a
 jury trial and even if such an error was not structural, it
 was not harmless beyond a reasonable doubt. Our precedent and
 the record undermine each of these arguments.

 ¶46
 In People v. Gregg, 2025 CO 57, ¶ 3,
 576 P.3d 725, 727-28, we concluded that the version of the
 habitual offender scheme at issue there (which is
 substantively the same as the version at issue in the present
 case) was not facially unconstitutional. In so concluding, we
 first observed, "A defendant is a habitual offender, and
 thus implicated in this sentencing scheme, if they have been
 convicted of a felony and 'three times previously
 convicted, upon charges separately brought and tried, and
 arising out of separate and distinct criminal
 episodes.'" Id. at ¶ 16, 576 P.3d at
 729 (quoting section 18-1.3-801(2)(a)(I), C.R.S. (2024)). We
 went on to note that although the plain language of section
 18-1.3-803(4), C.R.S. (2024), required the trial judge to
 determine whether the defendant had been convicted as
 alleged, the statute "did not explicitly
 prohibit the jury from finding that those prior
 convictions stemmed from separate and distinct criminal
 episodes." Id. at ¶ 24, 576 P.3d at 731.
Accordingly, we concluded that under the version of the
 habitual sentencing statute at issue there (which, again, is
 also at issue here):

[A] jury should first determine whether the defendant's
 prior convictions were based on charges arising out of
 separate and distinct

 criminal episodes. If the jury so finds, then the trial judge
 should review the jury's findings for sufficiency of the
 evidence, regarding whether the defendant "has been
 previously convicted as alleged." If the court
 determines that the jury's findings are supported by
 sufficient evidence, then it will enter the judgment and
 thereby satisfy the sentencing statute. Conversely, if the
 jury does not find that the defendant's prior convictions
 were based on charges arising out of separate and distinct
 criminal episodes, then the court must acquit the defendant
 of the habitual criminal counts.

Id. at ¶ 25, 576 P.3d at 731 (quoting §
 18-1.3-803(4)(b); other citation omitted).

 ¶47
 For these same reasons, we conclude that the habitual
 offender statute under which Brown was adjudicated is not
 facially unconstitutional. The question thus becomes whether
 (1) Brown's habitual offender adjudication must
 nonetheless be vacated because the trial court adjudicated
 Brown a habitual offender without permitting a jury to decide
 whether his prior felonies were based on charges arising out
 of separate and distinct criminal episodes and such an error
 was structural or (2) any error was harmless beyond a
 reasonable doubt. On this question, our decision in
 People v. Crabtree, 2024 CO 40M, ¶¶ 27,
 32, 550 P.3d 656, 664-65, is informative.

 ¶48
 In Crabtree, we concluded that errors of the kind
 presented here (i.e., those that omit an element of the
 offense from the jury's review) are nonstructural and
 therefore, when preserved, are subject to constitutional
 harmless error review. See id.; see also
Washington v. Recuenco, 548 U.S. 212, 218, 222 (2006)
(noting that "[f]ailure to submit a sentencing factor to
 the jury, like failure to submit an element

 to the jury, is not structural error" and that if the
 defendant was represented by counsel and was tried by an
 impartial tribunal, then there is a strong presumption that
 constitutional errors that may have occurred are subject to
 harmless error analysis); Neder v. United States,
 527 U.S. 1, 9 (1999) ("Unlike such defects as the
 complete deprivation of counsel or trial before a biased
 judge, an instruction that omits an element of the offense
 does not necessarily render a criminal trial
 fundamentally unfair or an unreliable vehicle for determining
 guilt or innocence.").

 ¶49
 Accordingly, under Crabtree, a preserved error like
 that at issue here is not structural but rather is subject to
 constitutional harmless error review. The question thus
 remains whether, on the facts presented, the error here was
 harmless beyond a reasonable doubt. See Hagos,
 ¶ 11, 288 P.3d at 119. We conclude that it was.

 ¶50
 During the habitual offender phase of the proceedings below,
 the People submitted evidence of Brown's prior felony
 convictions in Colorado for attempted theft (in Denver
 County) and forgery (one in Eagle County, one in Boulder
 County, and one in Douglas County) and in California for
 taking a vehicle without consent (one in Los Angeles County
 and one in San Diego County).

 ¶51
 To prove that Brown was the same defendant who had been
 convicted of felonies in each of these prior cases, the
 People presented, among other things,

 triple-certified case files for all but one of the judgments
 of convictions (the remaining file was dual certified). These
 files included, in different combinations, consistent
 physical descriptions of Brown; Brown's correct name,
 date of birth, and social security number (although one file
 had an apparent typographical error in the social security
 number); fingerprint cards with identical state
 identification numbers; and photographs of him.

 ¶52
 In addition, the case files for each of the foregoing matters
 reflected different guilty plea, conviction, and sentencing
 dates, ranging from 1995 to 2008, thus demonstrating that
 Brown's prior felonies indisputably arose out of separate
 and distinct criminal episodes.

 ¶53
 In these circumstances, the evidence presented on the
 habitual criminal counts against Brown was overwhelming, and
 any error in the trial court's adjudication of Brown as a
 habitual offender was harmless beyond a reasonable doubt.
See Bartley v. People, 817 P.2d 1029, 1034 (Colo.
1991) ("A constitutional error is harmless when the
 evidence properly received against a defendant is so
 overwhelming that the constitutional violation was harmless
 beyond a reasonable doubt.").

 ¶54
 In reaching this conclusion, we are unpersuaded by
 Brown's contentions that the prior felony records are
 unreliable because (1) some original exhibits were lost; (2)
 several of the prior convictions were decades old; and (3)
 the California

 offenses may have been eligible for reclassification as
 misdemeanors under California law.

 ¶55
 As noted above, all but one of the case files were triple
 certified. In particular, the triple-certified cases bore
 certifications from (1) the clerk or judicial assistant of
 the court attesting that the attached files were true and
 complete; (2) a judge of said court certifying the clerk or
 judicial assistant to be the custodian of records; and (3)
 the clerk or judicial assistant certifying the judge to be a
 judge of said court. All such certifications exhibited the
 court's seal. The other case file, while not triple
 certified, was dual certified and contained all of the
 foregoing markers of authenticity except for the final
 certification from the clerk certifying the judge to be a
 judge of the particular court. Accordingly, the case files
 were properly authenticated, and we perceive no basis on
 which to challenge their reliability. See Brown v.
 People, 238 P.2d 847, 851 (Colo. 1951) (concluding that
 triple-certified copies of final judgments containing
 certifications like those introduced here "clearly are
 amply and properly certified public records and come within
 all definitions of due authentication"); see
 also § 18-1.3-802, C.R.S. (2025) ("[A] duly
 authenticated copy of the record of former convictions and
 judgments of any court of record for any of said crimes
 against the party indicted or informed against shall be prima
 facie evidence of such convictions ....").

 ¶56
 In addition, the passage of time alone does not call into
 question the authenticity of records prepared before January
 1, 1998 when the records are "in such condition as to
 create no suspicion concerning [their] authenticity" and
 were found "in a place where [they], if authentic, would
 likely be." CRE 901(b)(8). The applicable record
 prepared before January 1, 1998 satisfied these requirements.

 ¶57
 Finally, even assuming without deciding that the felony
 convictions in California were eligible for misdemeanor
 reclassification, the record still demonstrates Brown's
 involvement in more than three prior felonies, thus
 satisfying the requirements of the habitual offender statute.

 ¶58
We therefore conclude that (1) the habitual offender statute
 was not facially unconstitutional and (2) any error in the
 trial court's adjudicating Brown as a habitual offender
 without submitting the matter to the jury was harmless beyond
 a reasonable doubt.

 III.
Conclusion

 ¶59
 For these reasons, we conclude that Manzo remains
 good law and is not distinguishable and therefore, the trial
 court did not reversibly err in entering judgment against
 Brown for LTS (death) and LTS (SBI) without requiring the
 prosecution to prove any culpable mental state.

 ¶60
We further conclude that the prior habitual offender statute
 under which Brown was adjudicated was not unconstitutional on
 its face and that any error in

the trial court's adjudicating Brown as a habitual
 offender without submitting the matter to the jury was
 harmless beyond a reasonable doubt.

 ¶61
 Accordingly, we affirm the division's judgment.

 JUSTICE SAMOUR concurred in part and concurred in the
 judgment only in part.

 JUSTICE SAMOUR, concurring in part and concurring in the
 judgment only in part.

 ¶62
 Popular culture is full of stories about characters who,
 sometimes after decades, struggle to break free from
 long-held opinions and assumptions. Good Will
 Hunting, the 1997 classic, captures this insight: People
 often hold tight to the beliefs they formed first, not
 necessarily because those beliefs are right, but because they
 are familiar, deeply ingrained, and worn in—providing a
 sense of security that alternatives do not. Letting go of a
 conclusion that has not aged well, even when compelling
 reasons point firmly in another direction, is never easy. I
 perceive that such reluctance may be playing out in this
 case.

 ¶63
 Twenty years ago, in People v. Manzo, 144 P.3d 551
(Colo. 2006), our court held that leaving the scene of an
 accident resulting in serious bodily injury ("LTS
 (SBI)") was a strict liability offense—even though
 it was a class 5 felony punishable by prison. That
 determination rested on a brittle foundation. And in the
 decades since, developments in the United States Supreme
 Court's jurisprudence and Colorado's statutory
 provisions have steadily eroded Manzo's footing.

 ¶64
 Rather than step back and reconsider, the majority doubles
 down and reaffirms Manzo's holding. In doing so,
 it overlooks that the ground beneath Manzo was shaky
 to begin with and has only grown more precarious with time.
Yes, stare decisis is a principle we live by. But stare
 decisis is a presumption, not

 a prison—a doctrine of stability, not an unyielding
 gatekeeper. And it recognizes that when continued adherence
 to precedent, in the face of change, would betray the
 law's underlying principles, its grip must loosen.
Otherwise, precedent becomes an anchor too heavy for the
 vessel of law to navigate wisely.

 ¶65
 Because I believe the time has come to put Manzo out
 to pasture, I strongly—but respectfully—register
 my unequivocal disagreement with the portion of the majority
 opinion that continues to consign leaving the scene of an
 accident ("LTS") to strict liability status. By
 allowing Manzo to dictate the path forward, the
 majority ensures that Colorado remains on an
 island—apparently the only state in the nation where
 courts refuse to impute a mens rea to an LTS statute that is
 silent on that element.

 ¶66
 But because the error in this case was constitutionally
 harmless, I concur in part and concur in the judgment only in
 part. Although course correction may offer little benefit to
 the defendant, Jason P. Brown, I write at length because this
 issue warrants attention. I see an urgent need to sound the
 alarm about what I perceive as a significant risk of grave
 injustice in Colorado. Consider this: Brown was convicted of
 a class 3 felony carrying a possible twelve-year prison
 sentence—he received forty-eight years after his
 habitual criminal adjudication—for leaving the scene of
 an accident resulting in death ("LTS (death)"),
 even though the prosecution was not required to
 prove that he was

 aware he'd been involved in an accident or otherwise
 acted with scienter. And while Brown himself may not have
 been morally blameless—an eyewitness told him he'd
 run over two people before he fled—his case
 nevertheless exposes a stark reality: Manzo and
 today's decision condemn drivers who are morally
 blameless to suffer the same fate. As I demonstrate, the
 question isn't whether such drivers are at risk of being
 unfairly charged, convicted, and sentenced in Colorado, but
 how many of them will be.

 ¶67
 And the kicker is that nobody appears to be coming to the
 rescue. The legislature has not seen fit to abrogate
 Manzo in the twenty years since its announcement,
 and this court today decides to defend it, giving the
 legislature even less reason to question it.

 I.
Analysis

 A.
 Colorado: We Have a Problem—And the Majority
 Doesn't See It

 ¶68
 The majority's insistence on following Manzo has
 serious consequences. By prolonging Manzo's
 reign, the majority ensures that Colorado drivers will
 continue to be charged, convicted, and punished under section
 42-4-1601(1), C.R.S. (2025), for LTS (SBI) or LTS (death),
 without proof of any awareness that they were involved in an
 accident.[1] Put differently, the majority holds fast
 to Manzo's

 ill-advised conclusion that LTS is a strict liability
 offense—indifferent to whether the driver acted
 intentionally, knowingly, recklessly, or negligently.

 ¶69
 Notably, during oral argument, the People
 acknowledged—almost with a shrug—that strict
 liability could "result hypothetically in the rare
 prosecution of a morally blameless defendant." They
 added that this was a calculated legislative choice—one
 they deemed acceptable because, in their estimation, morally
 blameless drivers "will be in the small minority,"
 and strict liability is needed to advance public-safety
 goals. I did a double take when I heard the remark. I did
 another just now after writing it down. The prospect of an
 innocent driver being swept into the gears of the criminal
 justice machine—even if rare—cannot be written
 off as an unfortunate but tolerable cost of doing business.

 ¶70
 Whatever happened to the "fundamental value
 determination of our society that it is far worse to convict
 an innocent man than to let a guilty man go free"?
Schlup v. Delo, 513 U.S. 298, 325 (1995)
(quoting In re Winship, 397 U.S. 358, 372 (1970)
(Harlan, J, concurring)). Isn't it still a maxim of the
 law "that it is better that ninety-nine . . . offenders
 should escape, than that one innocent man should

 be condemned"? Thomas Starkie, Treatise on the Law of
 Evidence 756 (1824) (quoted with approval in Schlup,
 513 U.S. at 325). This principle is not some quaint relic
 gathering dust on a shelf; it is the bedrock of our criminal
 justice system. Indeed, the "concern about the injustice
 that results from the conviction of an innocent person has
 long been at the core of our criminal justice system."
Schlup, 513 U.S. at 325.

 ¶71
 Yet even in the face of the People's concession—an
 open admission that innocence may hypothetically be
 collateral damage—my colleagues in the majority choose
 to stand by Manzo. I cannot join them. When the law
 tolerates the very real risk of the conviction of the morally
 blameless, it has drifted perilously far from its moral
 underpinnings.

 ¶72
 And to be clear, although the People referred to strict
 liability "hypothetically" allowing morally
 blameless drivers to be punished for LTS (death), there is
 nothing "hypothetical[]" about that prospect. Over
 and over, appellate courts across the country have intervened
 to prevent injustices in cases involving drivers who stood
 convicted of LTS, even though they genuinely appeared to have
 been unaware that an accident had occurred. A brief
 survey—one by no means comprehensive—makes the
 point unmistakably.

 ¶73
 Start with a case from Florida that highlights the point
 vividly. In State v. Dorsett, 158 So.3d 557, 558
(Fla. 2015), a teenage skateboarder lost control and slid

 under the side of a large pickup truck driven by Dorsett. It
 was raining; the windows were up; the wipers and air
 conditioning were on; and a portable radio was playing at
 full volume. Id. There was no impairment, no evasive
 maneuver, no sign of braking, no change in speed, and no
 visible damage to the front of Dorsett's truck.
Id. at 559. Dorsett appeared genuinely surprised
 when stopped by law enforcement three miles from the
 accident. Id. at 558-59. Although the LTS statute
 did not expressly require "actual knowledge" of an
 accident, the Florida Supreme Court held that the
 statute's requirement of a "willful" violation
 necessitated proof that the driver had actual knowledge that
 an accident had occurred. Id. at 560. Because the
 jury had not been instructed on that essential element, the
 court reversed the conviction.[2] Id. at 563.

 ¶74
 Illinois sees it the same way. In People v. Nunn,
 382 N.E.2d 1305, 1306 (Ill.App.Ct. 1978), aff'd,
 396 N.E.2d 27 (Ill. 1979), Nunn's truck struck a vehicle
 in the early morning hours, but he testified that he had
 fallen asleep and was awakened only by a "thud."
After pulling over shortly thereafter, he inspected his
 truck, saw only a dent, and reasonably assumed he had hit an
 animal. Id. The jury was

 instructed on LTS without any requirement that the State
 prove he knew an accident involving a person had occurred.
Id. at 1307. The Illinois appellate court reversed
 the conviction. Id. at 1309. It held that, although
 the state's LTS statute lacked an express culpable mental
 state, knowledge was nonetheless an essential element of the
 offense. Id. at 1308-09. The court stressed that the
 purpose of hit-and-run statutes cannot be served where a
 driver is genuinely unaware of a collision. Id. at
 1308. And it recognized—correctly—that accidents
 may occur without the driver's knowledge. As the court
 observed, "[e]xamples can come to mind where the driver
 neither knows nor should have known of the occurrence of an
 accident." Id. For instance, continued the
 court, "if a pedestrian walks into the side of a moving
 car or truck or perhaps his clothing becomes entangled with a
 passing motor vehicle, it is quite possible that the driver
 will be unaware of the incident even though properly
 operating his motor vehicle." Id. The court
 reasoned that "[t]here would appear to be no useful
 purpose served in imposing criminal sanctions for such
 conduct." Id.

 ¶75
 Iowa is part of the chorus. In State v. Miller, 308
 N.W.2d 4, 5 (Iowa 1981), Miller's truck, caked in mud
 with only a small portion of the windshield cleared, struck a
 pedestrian. He testified that he continued driving normally
 because he neither saw nor felt anything that would have
 alerted him to the collision. Id. Because the LTS
 statute didn't include a knowledge requirement, the jury
 was

 instructed without one. Id. at 5-6. The Iowa Supreme
 Court reversed the conviction, holding that scienter was an
 essential element of LTS given the seriousness of the
 penalties associated with the offense. Id. at 6-7.

 ¶76
 Kansas is on the same page. In State v. Wall, 482
 P.2d 41, 43 (Kan. 1971), Wall collided with another vehicle
 late at night. His abandoned truck was found in a ditch about
 100 feet from the victim's car. Id. When
 officers located him shortly afterward in a different
 location, he was in a dazed and bewildered condition, with
 significant injuries and no memory of the accident.
Id. at 44. Although the LTS statute did not
 expressly require knowledge of the accident, the state
 supreme court reversed the conviction and held that such
 knowledge was an "essential" element of the
 offense. Id. at 45. The legislature, it explained,
 could not have intended criminal liability to attach where a
 driver is unaware of the collision. Id. ¶77
 Kansas's neighbor, Missouri, traveled the same analytical
 road when confronted with a comparable situation in State
 v. Palmer, 822 S.W.2d 536, 541 (Mo.Ct.App. 1992). Palmer
 felt an impact while rounding a curve but, after checking his
 mirrors and seeing no damage, assumed—reasonably, given
 his long familiarity with the area—that he had struck a
 deer. Id. at 538-39. The State presented no evidence
 beyond Palmer's acknowledgment of an impact to show that
 he knew he had struck or injured a person. Id. at
 541. The appellate court

 reversed his conviction for LTS involving personal injury,
 concluding that the statute defining the offense required
 proof of knowledge. Id.

 ¶78
 Alabama reached the same bottom line. In Touchstone v.
 State, 155 So.2d 349, 350 (Ala. Ct. App. 1963), two boys
 were killed near a highway as Touchstone's extremely loud
 tractor-trailer passed by. Later examination of the front of
 the tractor-trailer revealed blood, hair, and fabric matching
 the victims. Id. Yet nothing in the record suggested
 Touchstone knew he had struck anyone, and there was no
 indication that he had attempted to conceal or remove the
 physical evidence from his tractor-trailer. Id. at
 352. Because Alabama's LTS statute required proof of
 knowledge—and the State presented none—the
 appellate court reversed the conviction. Id.

 ¶79
 Virginia rows in the same direction. In Herchenbach v.
 Commonwealth, 38 S.E.2d 328, 329-30 (Va. 1946), the
 Virginia Supreme Court concluded that Herchenbach had been
 improperly convicted of LTS while driving a bus that hit and
 killed a bicyclist. The court noted that at the time of the
 accident, it was dark and foggy, Herchenbach wouldn't
 have felt the impact, and there was no indication he had
 attempted to conceal the blood and hair found on one of the
 tires on the bus. Id. at 330. That the LTS statute
 didn't include a mens rea requirement didn't alter
 the analysis. Id. The court reasoned as follows:
 "How can a person perform these affirmative acts [in the
 LTS statute] unless he knows that his vehicle

 has struck a person or an object? Knowledge necessarily is an
 essential element of the crime." Id. at 329.

 ¶80
 Finally, Rhode Island marches in step. In State v.
 Baker, 627 A.2d 835, 836-39 (R.I. 1993), Baker had been
 violently beaten at a bachelor party immediately before
 getting in his truck and driving away. Disoriented, bleeding,
 and later reporting no memory of where he had driven, he
 unknowingly struck a pedestrian. Id. at 838-39. He
 was genuinely surprised when he learned of the accident the
 next morning at the police station while reporting the
 assault at the party. Id. at 839. Although the LTS
 statute required knowledge of involvement in an accident, the
 trial court denied his motion for judgment of acquittal.
Id. The Rhode Island Supreme Court reversed, finding
 the evidence insufficient even under a "knew or should
 have known" standard. Id. at 841. Because
 Baker's head injuries and disorientation made any
 inference of awareness untenable, the court directed entry of
 a judgment of acquittal. Id.

 ¶81
 Under Manzo and today's decision, Dorsett, Nunn,
 Miller, Wall, Palmer, Touchstone, Herchenbach, and Baker all
 would have lost on appeal in Colorado.[3]

The rationale in Manzo and in today's decision
 seems to rest on the assumption that a driver cannot be
 involved in an accident without realizing it—an
 assumption that case after case proves unfounded. The eight
 examples I've offered are only a glimpse; they represent
 but one tile in a sprawling mosaic of cases that have
 acknowledged that accidents happen without drivers being
 aware of them. See, e.g., State ex rel.
 Korkosz, 393 So.2d 332, 333-34 (La. Ct. App. 1980)
(noting that a mens rea requirement was added to the state
statute "specifically because many accidents happen at
 night and the driver is not aware that an accident has
 occurred"). And even if such situations arise
 infrequently, I cannot accept the risk they create. Even a
 single morally blameless driver being falsely accused,
 convicted and punished under section 42-4-1601(1) is one too
 many.

 B.
Constitutional Missteps in Manzo
and Today's Decision in Light of United States
 Supreme Court Precedent

 ¶82
 The majority's apparent willingness to accept the genuine
 risk of having morally blameless drivers charged, convicted,
 and punished under section 42-4-1601(1) reflects a
 misapprehension of the constitutional concerns at hand.
Although the majority concludes that "the trial court
 did not . . . violate Brown's right to due process"
 in entering judgment for leaving the scene of an accident
 resulting in LTS (death) without requiring proof that he
 acted with any culpable mental state, it doesn't explain
 why that is so. Maj. op. ¶ 2. In fact, the
 majority uses the term "due process" only three
 times in its entire opinion—and one of

 those instances appears merely in reciting the issues we
 agreed to review, including whether the trial court violated
 Brown's "right to due process." Id. at
 ¶ 1. The majority ultimately resolves the defense's
 full-throated due process claim in conclusory fashion, simply
 opining that declining to read section 42-4-1601(1) as
 implying a culpable mental state does not violate due
 process—i.e., it is so because the majority says so.
Id. at ¶¶ 1-2.

 ¶83
 To the extent the majority handcuffs the defense's
 constitutional challenge to the question whether the Supreme
 Court's recent decision in Rehaif overruled
 Manzo, it mischaracterizes Brown's position.
Both in his briefs and at oral argument, Brown argued at
 length that Manzo is unsound precedent—apart
 from his further claim that recent developments, including
 Rehaif, have only made clearer that Manzo
 is a house of cards.[4] As I explain in this opinion, the defense
 is correct on both fronts.

 ¶84
 Rather than grapple with the constitutional questions, the
 majority treats Manzo as its north star and adheres
 to it. Consequently, it devotes nearly its entire analysis to
 legislative intent. See id. at ¶¶ 36-44.
The majority states that it is

"constrained to follow the plain language of . . .
 section 42-4-1601." Id. at ¶ 41. With
 that, it effectively washes its hands of any potential
 resulting inequity, concluding that the remedy question
 "is more appropriately directed to our General
 Assembly." Id.

 ¶85
 But we cannot sidestep constitutional questions simply by
 pointing to the legislature. Those issues fall
 squarely within our domain, and we should not shirk our
 responsibility by treating legislative intent as a substitute
 for constitutional analysis. Rather, when it comes to
 constitutional questions, the buck stops with us—the
 courts.

 ¶86
 Importantly, those constitutional concerns bear directly on
 how we interpret a statute defining a criminal offense. We
 cannot properly construe section 42-4-1601(1) without
 accounting for them. It is precisely those concerns that have
 prompted the Supreme Court, time and again, to underscore the
 strong presumption in favor of scienter. Don't take my
 word for it, though—as I discuss next, the Court has
 spoken unequivocally and repeatedly on this subject, and its
 stance on the issue has remained unwavering for decades.

 1. How
 Constitutional Defects in the Majority Opinion Lead to the
 Misinterpretation of Section 42-4-1601(1)—History
 Repeating Itself After Manzo

 ¶87
 In determining Congress's intent, the Supreme Court's
 starting point is the "longstanding presumption . . .
 that Congress intends to require a defendant to

 possess a culpable mental state regarding 'each of the
 statutory elements that criminalize otherwise innocent
 conduct.'" Rehaif v. United States, 588
 U.S. 225, 228-29 (2019) (quoting United States v.
 X-Citement Video, Inc., 513 U.S. 64, 72 (1994)). We must
 construe a statute in light of the
 "firmly-embedded" background rule requiring some
 mens rea for a crime. Staples v. United
 States, 511 U.S. 600, 605 (1994) (citation omitted).
This interpretive maxim, which the Supreme Court reaffirmed
 in Rehaif just seven years ago, has been
 characterized as "a presumption in favor of
 'scienter'"—i.e., "a presumption that
 criminal statutes require the degree of knowledge sufficient
 to 'mak[e] a person legally responsible for the
 consequences of his or her act or omission.'"
Rehaif, 588 U.S. at 229 (alteration in original)
(quoting Scienter, Black's Law Dictionary (10th
 ed. 2014)).

 ¶88
"There can be no doubt that this established concept has
 influenced [the Supreme Court's] interpretation of
 criminal statutes." Staples, 511 U.S. at 605.
So critical is this presumption that it applies "even
 when Congress does not specify any scienter in the statutory
 text." Rehaif, 588 U.S. at 229. In fact, the
 Supreme Court's reverence for the presumption may best be
 reflected in cases in which it has "interpreted statutes
 to include a scienter requirement" despite
 "'the most grammatical reading'" not
 supporting one. Id. at 231 (quoting X-Citement
 Video, Inc., 513 U.S. at 70). Relying on the strength of
 the presumption, the Court has cautioned that "offenses
 that require no mens rea generally are
 disfavored," and

 has "suggested that some indication of congressional
 intent, express or implied, is required to dispense with
 mens rea as an element of a crime."
Staples, 511 U.S. at 606.

 ¶89
 But the presumption of scienter is hardly novel. It traces
 its lineage to the common law—it is as American as
 apple pie. It is a basic principle undergirding our criminal
 law —a precept with an ancient and sturdy pedigree.
Id. at 605-06. Blackstone referred to it centuries
 ago as a "vicious will." Id. at 616-17
(quoting 4 William Blackstone, Commentaries *21
 (1769)). As the Court observed in Morissette v. United
 States, 342 U.S. 246, 251-52 (1952), the idea
 that crime requires both "an evil-meaning mind" and
 "an evil-doing hand . . . was congenial to an intense
 individualism and took deep and early root in American
 soil."

 ¶90
 Today, "the understanding that an injury is criminal
 only if inflicted knowingly 'is as universal and
 persistent in mature systems of law as belief in freedom of
 the human will and a consequent ability and duty of the
 normal individual to choose between good and evil.'"
Rehaif, 588 U.S. at 231 (quoting
Morissette, 342 U.S. at 250). "Scienter
 requirements advance this basic principle of criminal law by
 helping to 'separate those who understand the wrongful
 nature of their act from those who do not.'"
Id. (quoting X-Citement Video, Inc., 513
 U.S. at 72 n.3).

 ¶91
 It is difficult to conceive of language that stresses the
 significance of the presumption of scienter more
 emphatically. Unsurprisingly, the cases in which the Supreme
 Court has highlighted scienter's importance in
 distinguishing wrongful from innocent acts "are
 legion." Id.

 ¶92
Manzo, however, didn't mention—let alone
 apply—this presumption in interpreting section
 42-4-1601(1). Instead, it concluded that nothing in the
 statute indicated an implied culpable mental state.
Manzo, 144 P.3d at 552. That conclusion was doubly
 erroneous: First, as noted, it was reached without applying
 the presumption of scienter; and second, even apart from that
 fatal flaw, our legislature has furnished ample reason to
 impute a culpable mental state. I explore the latter point
 now.

 ¶93
 As our court acknowledged in Manzo, the mere absence
 of an express culpable mental state in a statute defining an
 offense does not automatically equate to strict liability.
Id. at 556. This understanding is based on our
 legislature's declaration that, despite the omission of
 scienter in a criminal statute, a culpable mental state
 "may nevertheless be required for the commission of that
 offense, or with respect to some or all of the material
 elements thereof, if the proscribed conduct necessarily
 involves such a culpable mental state." Id.
(quoting § 18-1-503(2), C.R.S. (2006)). Manzo
 also correctly observed that our role in

 determining whether a statute contains an implied culpable
 mental state is to discern the legislature's intent.
Id. So far so good.

 ¶94
 But, alas, Manzo faltered at the next step.
According to Manzo, the language of section
 42-4-1601(1) "does not reflect a legislative intent to
 require a culpable mental state" because it requires
 "a driver involved in an accident" to
 "'immediately stop,'" which is a "a
 mandatory duty." Id. (quoting §
 42-4-1601(1)). "Thus," Manzo concluded,
 the statute "does not involve a culpable mental
 state." Id. With all due respect, this is as
 circular as circular gets.

 ¶95
 It is also backwards. Given that the statute imposes a
 mandatory duty to immediately stop if a driver has been
 involved in an accident, the driver must necessarily be
 aware that an accident has occurred. How does that not
 imply a culpable mental state? If a driver is unaware that an
 accident has occurred—and I've cited numerous cases
 showing that this does happen—how can there be a duty,
 backed by the threat of a felony conviction and severe
 punishment, to take the prescribed action? "[O]ne cannot
 stop at or return to the scene of a personal injury accident
 he does not know has occurred. Cognizance of the accident,
 then, is implicit in the obligations imposed by the
 statute." Comstock v. State, 573 A.2d 117, 123
(Md. Ct. Spec. App. 1990); accord Herchenbach, 38
 S.E.2d at 329 (indicating that, although the LTS statute
 omitted a scienter requirement, knowledge of the accident was

 nevertheless a necessary element of the crime because,
 without such knowledge, the driver could not be expected to
 stop).

 ¶96
 The Minnesota Supreme Court recently captured the point when
 it declined to follow the strict liability route, even though
 the state's LTS statute included no mens rea requirement:

[T]he act of continuing to drive (or failing to stop) is not
 criminal in itself, but only becomes criminal if the driver
 has caused an accident that is of the type that imposes a
 legal obligation to stop. In order for a person to be
 criminally liable for failing to stop, basic fairness
 requires that the person be on notice that events that
 trigger the legal duty to stop have occurred.

State v. Al-Naseer, 734 N.W.2d 679, 686 (Minn. 2007)
(emphasis added).[5] And the Nevada Supreme Court sounded the
 same note more recently in Clancy v. State, 313 P.3d
 226 (Nev. 2013). There, after acknowledging that the
 state's LTS statute did not expressly require proof of
 the driver's knowledge of involvement in an accident, the
 court nonetheless recognized such a requirement:

The purpose behind [the LTS statute] is to require drivers
 involved in an accident to stop and provide identifying
 information and render reasonable assistance to injured
 persons .... "Implicit therein must be the element of
 recognition or awareness on the part of that driver of the
 fact of [an accident]." [Wall, 482 P.2d at 45.]
The statute's purpose is not served where the driver
 is unaware of the event requiring him to stop and provide
 identifying information and render assistance—the
 accident. In that situation, the statute does nothing to
 encourage the driver to stop

 and provide information and render assistance; the driver did
 not stop because he was not aware that there was a reason to
 do so.

Id. at 229-30 (second alteration in original)
(emphasis added).

 ¶97
 There is a constellation of cases like Comstock,
 Herchenbach, Al-Naseer, and
 Clancy. See, e.g., State v.
 Martin, 440 P.2d 429, 436 (Wash. 1968) ("It is
 inconceivable that the legislature intended that punishment
 would be imposed for failure to follow the course of conduct
 outlined, if the operator of the vehicle was ignorant of the
 happening of an accident."); State v. Ray, 47
 S.E.2d 494, 495 (N.C. 1948) ("It would be a manifest
 absurdity to expect or require the driver of a motor vehicle
 to perform the acts specified in the statute in the absence
 of knowledge that his vehicle has been involved in an
 accident resulting in injury to some person.");
Pardo v. State, 160 A.3d 1136, 1145 (Del. 2017)
("Drivers logically must have knowledge that a collision
 has occurred before the duty to stop and render assistance
 can be triggered. It is not reasonable to believe the General
 Assembly intended for a penalty to be imposed for failure to
 perform certain duties if the driver was unaware of the
 collision."); Kimoktoak v. State, 584 P.2d 25,
 31 (Alaska 1978) ("[N]umerous jurisdictions have enacted
 'hit and run' statutes which, like ours, fail to
 expressly require that the accused knowingly fail to stop and
 render assistance. The great majority of courts have found
 the knowledge requirement to be implicit in these
 statutes."); State v. Lemme, 244 A.2d 585, 589
(R.I. 1968)

("Obviously, however, knowledge is so essentially an
 element of the offense as to be necessarily implied if not
 expressed.").

 ¶98
 Looking at the tapestry these courts have woven, it is
 inconceivable that our General Assembly intended to punish
 drivers for failing to fulfill the duties it set forth
 without awareness that they were involved in an accident.
There are no two ways about it: Proof of scienter must be a
 prerequisite to meeting the statute's obligations.
Concluding otherwise—as Manzo did and the
 majority does—leads to illogical or absurd results. And
 our rules of statutory interpretation instruct us to avoid
 precisely such illogical or absurd results. See Brubaker
 v. Colo. Sun, 2026 CO 18, ¶ 34, 586 P.3d 706, 714.

 ¶99
 It is no wonder Colorado has become a self-contained universe
 in this field. As the Delaware Supreme Court noted in 2017,
 "[w]e encountered only one state that imposes strict
 liability for hit-and-run collisions where the statute is
 silent with respect to the mental culpability required to
 secure a conviction." Pardo, 160 A.3d at 1146
 n.39 (citing Manzo, 144 P.3d at 558-59); see
 also Al-Naseer, 734 N.W.2d at 684 ("At least one
 state has held that strict liability applies where the
 statute is silent about mens rea in [an LTS] statute."
(citing Manzo, 144 P.3d at 559)). This is no badge
 of honor; it's a cursed heirloom.

 ¶100
 But as unfortunate as Manzo's circular and
 backwards reasoning is, it accounts for only half of the
 legislative-intent story. The court compounded its

 misguided analysis by viewing "other traffic
 offenses" that "do not require a culpable mens
 rea" as bolstering its holding. Id. at 556-57
(referring to driving under the influence ("DUI"),
 driving while ability impaired ("DWAI"), and
 speeding). Yet those offenses actually undercut its
 holding. Unlike section 42-4-1601(1), the statutes governing
 DUI/DWAI and speeding explicitly state that they are strict
 liability offenses. See § 42-4-1301(3), C.R.S.
 (2025) (indicating DUI/DWAI are "strict liability"
 offenses); § 42-4-1101(11)(a), C.R.S. (2025) (stating
 that it is not a defense to a charge of speeding that
 "[t]he defendant's conduct was not performed
 intentionally, knowingly, recklessly, or with criminal
 negligence"). Other traffic offenses are of the same ilk
 as DUI/DWAI and speeding. See §
 18-3-106(1)(b)(I), C.R.S. (2025) (stating that vehicular
 homicide (DUI/DWAI) is "a strict liability crime");
§ 18-3-205(1)(b)(I), C.R.S. (2025) (stating that
 "vehicular assault" (DUI/DWAI) is "a strict
 liability crime").

 ¶101
 The most sensible conclusion to draw is that when the
 legislature intends to classify a traffic offense as a strict
 liability one, it says so expressly. The Model Penal Code,
 which our criminal code is modeled after, has a general rule
 that requires a state legislature to expressly state its
 intent when it means to have strict liability apply to a
 crime. See Model Penal Code § 2.05(1) cmt. 1
 (A.L.I. 1985), (indicating that "strict liability may be
 applied only if a legislative purpose to that effect plainly
 appears"). This makes sense given the presumption of
 scienter and

 the constitutional principles animating it. Section
 42-4-1601(1) offers no hint that the legislature meant to
 classify LTS (death) and LTS (SBI) as strict liability
 offenses. What I reasonably infer, then, is that strict
 liability was never the design.

 ¶102
 Although the majority engages in an extensive discussion of
 the legislature's intent in amending section 42-4-1601,
 it largely overlooks the on-point authority I've
 discussed. It doesn't reckon with the fact that the
 legislature has expressly stated its intent when drafting
 other strict liability traffic offenses. And with respect to
 the presumption of scienter the Supreme Court has hammered
 for decades, it offers little more than a courteous bow.
Rather than heed the Supreme Court's jurisprudence on the
 vital role the presumption plays in interpreting criminal
 statutes, the majority attempts to prop up
 Manzo's construction of section 42-4-1601(1)
 with two pillars—legislative history and statutory
 history. Maj. op. ¶ 36. But a closer inspection reveals
 that both are made of bungaroosh and cannot support the
 weight the majority places on them.

 ¶103
 Let's take legislative history first. The majority spends
 nearly two pages extolling the amendments to section
 42-4-1601 that ratcheted up the felony classifications and
 penalties for LTS (death) and LTS (SBI). Maj. op. at
 ¶¶ 36-38. That history, however, proves nothing of
 consequence here. In all the commentary the majority quotes,
 not a single line—not one—mentions "strict
 liability" or the absence of a "culpable mental
 state." No legislator or speaker discusses an intent

 to accord strict liability status to LTS (death) or LTS
 (SBI). Nor does anyone confront the unfairness of imposing
 heightened felony punishment on drivers who are unaware that
 an accident has even occurred. Every comment the majority
 relies on assumes a driver who knows an accident has happened
 and chooses to flee to avoid accountability. Id. at
 ¶ 37. At most, the legislative history shows that the
 General Assembly wanted to align LTS (death) with vehicular
 homicide (DUI/DWAI) and to place LTS (SBI) on equal footing
 with vehicular assault (DUI/DWAI)—both moves designed
 to remove any incentive for a driver involved in an
 accident to leave the scene. But incentive presupposes
 awareness. Drivers cannot be tempted to flee an accident
 they do not realize has occurred. Without awareness, the very
 premise of incentive collapses.

 ¶104
 The statutory history offers the majority no lifeline either.
The majority places considerable weight on the fact that,
 although the legislature has amended section 42-4-1601 four
 times since Manzo—never as to subsection (1),
 the subsection at issue—our General Assembly has never
 added a culpable mental state requirement or otherwise
 signaled disagreement with that decision. But the majority
 forgets that we have recently discounted the value of this
 kind of silent statutory history, recognizing that it often
 assumes more than it proves.

 ¶105
 As we stated just a handful of years ago, "[i]t is
 'impossible to assert with any degree of assurance that
 [legislative] failure to act represents' affirmative

[legislative] approval of the Court's statutory
 interpretation." People v. Jones, 2020 CO 45,
 ¶ 65, 464 P.3d 735, 747 (alterations in original)
(quoting Patterson v. McLean Credit Union, 491 U.S.
 164, 175 n.1 (1989)). In Jones, we declined the
 prosecution's invitation to infer legislative intent from
 the lack of an amendment to "the definition of
 'child' or 'person'" in the child abuse
 statute following the court of appeals' interpretation of
 those terms in People v. Lage, 232 P.3d 138
(Colo.App. 2009), even though the statute had been amended
 multiple times after that decision. Jones, ¶
 63, 464 P.3d at 747.

 ¶106
Jones was only treading the ground the Supreme Court
 had already cleared. That Court has long cautioned that
 "'[c]ongressional inaction lacks persuasive
 significance' in most circumstances." Star
 Athletica, L.L.C. v. Varsity Brands, Inc., 580 U.S. 405,
 424 (2017) (alteration in original) (quoting Pension
 Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650
(1990)). And the Court has been especially wary of drawing
 meaning from legislative silence where, as here, the
 legislature "has not comprehensively revised a statutory
 scheme but has made only isolated amendments."
Alexander v. Sandoval, 532 U.S. 275, 292 (2001).
Like the Supreme Court, I view it as "at best
 treacherous to find in [legislative] silence alone the
 adoption of a controlling rule of law." United
 States v. Wells, 519 U.S. 482, 496 (1997) (quoting
NLRB v. Plasterers' Loc. Union No. 79, 404 U.S.
 116, 129-130 (1971)). As the Court memorably put it in
 Zuber v. Allen, 396 U.S. 168, 185 (1969),

"[l]egislative silence is a poor beacon to follow in
 discerning the proper statutory route."

 ¶107
 In short, when I set the legislative and statutory history on
 which the majority leans against the all-important
 presumption of scienter and the far stronger evidence of
 legislative intent that I've brought out of the shadows,
 the majority's foundation crumbles. And because we must
 "construe statutes in such a way as to avoid calling
 their constitutional validity into question," People
 v. Lee, 2020 CO 81, ¶ 11, 476 P.3d 351, 354, I
 would conclude that section 42-4-1601(1) implies a culpable
 mental state.

 2. The
 Culpable Mental State Implied by Section 42-4-1601(1) Is
 Knowingly—There Must Be Knowledge of an Accident of the
 Type Imposing a Duty to Stop

 ¶108
 Having decided that section 42-4-1601(1) implies a culpable
 mental state, the question that naturally flows is: which
 one? See § 18-1-501(3), (5), (6), (8), C.R.S.
 (2025) (setting out four culpable mental
 states—intentionally, knowingly, recklessly, and
 criminal negligence). I would conclude that the appropriate
 one is knowingly. Both the court of appeals and our court
 have generally imputed the culpable mental state of knowingly
 when statutory provisions not expressly designated strict
 liability offenses "are silent on a culpable mental
 state and there is no clear reason to resort to a different
 culpable mental state." Randolph v. People,
 2025 CO 44, ¶ 57, 570 P.3d 1022, 1034; see also
Gorman v. People, 19 P.3d 662, 666

(Colo. 2000) (recognizing that "we have held that the
 mens rea of knowingly applies to the act enunciated in the
 statute . . . when the statute does not specify a culpable
 mental state"); People v. Moore, 674 P.2d 354,
 358 (Colo. 1984) (imputing the culpable mental state of
 knowingly in the counterfeit controlled substances statute);
People v. Bridges, 620 P.2d 1, 3 (Colo. 1980)
(concluding that the culpable mental state of knowingly is
 implied by the statute proscribing engaging in a riot),
 overruled in part on other grounds by, People v.
 Jeffers, 690 P.2d 194 (Colo. 1984); People v.
 Lawrence, 55 P.3d 155, 163 (Colo.App. 2001) (inferring,
 from a statutory provision proscribing the wasteful
 destruction of wildlife, the culpable mental state of
 "knowingly" because "[n]othing in [the
 statutory] language logically is tied to 'specific
 intent,' 'recklessness,' or
 'neglect'"), abrogated on other grounds by,
 Crawford v. Washington, 541 U.S. 36 (2004).

 ¶109
 Here, there is no reason to resort to a mental state
 different than knowingly. As noted, to avoid the imposition
 of impossible duties, section 42-4-1601(1) must be construed
 as requiring proof that the driver was aware there was an
 accident. Because knowingly is all about
 "aware[ness]," see § 18-1-501(6), it
 fits the bill perfectly. And imputing knowingly is in
 lockstep with what courts across the country have done in
 interpreting LTS statutes without an express mens rea.
See supra at ¶¶ 32-34.

 ¶110
 Drawing from the Minnesota Supreme Court's thoughtful
 analysis in Al-Naseer, I would then require proof of
 "knowledge that the driver's vehicle was in an
 accident of the type that imposes a duty to stop." 734
 N.W.2d at 687. In Minnesota, that means knowledge that the
 driver's vehicle was in an accident "involving a
 person or another vehicle." Id. Because
 Colorado's LTS statutory scheme is a little more
 expansive, the relevant knowledge required here would be that
 the driver's vehicle was in an accident involving a
 person, a vehicle, other property, or fixtures or traffic
 control devices. See § 42-4-1601(1) (addressing
 a person who suffers injury, SBI or death); § 42-4-1602,
 C.R.S. (2025) (referring to damage to a driven or attended
 vehicle); § 42-4-1604, C.R.S. (2025) (relating to damage
 to an unattended vehicle or other property); §
 42-4-1605, C.R.S. (2025) (discussing damages to fixtures or
 traffic control devices upon or adjacent to a highway).

 ¶111
 Colorado's LTS statutory scheme does not impose
 obligations for all accidents. Whatever knowledge is required
 must correspond to the categories of accidents that actually
 trigger statutory duties. To be clear, however, this would
 not call for proof of awareness of the resulting
 harm—nothing supports extending the culpable mental
 state to the resulting harm. Thus, to charge a driver with
 LTS (death), the prosecution would not be required to prove
 that the driver was aware there was an accident that
 resulted in someone's death. Instead, what would be

 required is that the driver was aware there was an accident
 of the type that imposes a duty to stop. In other words, the
 prosecution would have the burden of proving only that the
 driver was aware there was an accident and that the accident
 involved either a person, a vehicle, other property, or
 fixtures or traffic control devices.

 ¶112
 The majority voices concern that requiring knowledge of
 involvement in an accident in Colorado would conflict with
 the settled principle that a mens rea term "applies to
 all elements of an offense unless the statute
 clearly indicates otherwise." Maj. op. ¶ 42 (citing
§ 18-1-503(4)). Under section 18-1-503(4), urges the
 majority, that would mean requiring knowledge not only of
 involvement in an accident but also of the resulting death,
 injury, or damage—unless the statute clearly indicates
 otherwise.

 ¶113
 Here, though, the statute does clearly indicate
 otherwise. As discussed, there is ample basis to infer that
 section 42-4-1601(1) requires knowledge of involvement in an
 accident of the type that imposes the legislature's
 mandated duties. But there is no basis to infer that the
 statute requires knowledge of anything else. See
§ 18-1-503(2) (stating that even where a statute omits a
 culpable mental state, one "may nevertheless be required
 for the commission of that offense, or with respect to
 some . . . of the material elements thereof"
(emphasis added)); see also Gorman, 19 P.3d at 666
(stating that Colorado case law recognizes that the mens rea
 of knowingly

 applies to "the act enunciated in the statute" when
 the statute is silent on a culpable mental state). Thus, my
 analytical framework comports with section 18-1-503(4);
 nothing in that provision impedes imputing the mens rea of
 knowingly to a single element—involvement in an
 accident of the type imposing a duty to stop.

 ¶114
 To be clear, requiring proof of the mens rea of knowingly
 with respect to the act described in section 42-4-1601(1)
 does not mean the prosecution must produce direct evidence
 that the driver acted knowingly—no, the prosecution may
 rely entirely on circumstantial evidence. As the Minnesota
 Supreme Court explained in Al-Naseer, "[a]ctual
 knowledge that there was a duty to stop is proven where the
 circumstantial evidence leads the fact finder to conclude,
 beyond a reasonable doubt, that the driver must have known
 that there was an accident" of the type that imposes a
 duty to stop. 734 N.W.2d at 688.

 ¶115
 Other jurisdictions have arrived at the same destination,
 recognizing that the knowledge element in an LTS case may be
 established—just as in the prosecution of any other
 crime—through circumstantial evidence. See,
 e.g., State v. Nekolite, 939 N.W.2d 850, 854
(S.D. 2020) (explaining that "knowledge of the accident
 is required" and that such knowledge "can be
 established, like other facts in criminal prosecutions, with
 circumstantial evidence"); Wall, 482 P.2d at 43
(observing that knowledge may be proven through
 "circumstantial evidence, so

 long as that evidence satisfies the applicable requirements
 of consistency"); State v. Sidway, 431 A.2d
 1237, 1239-40 (Vt. 1981) (noting that "a majority of
 jurisdictions . . . permit the necessary knowledge to be
 imputed to the defendant by the use of circumstantial
 evidence"); People v. Wells, 186 A.D.2d 867,
 868-69 (N.Y.App.Div. 1992) (concluding that circumstantial
 evidence supported the defendant's conviction where he
 had been operating the van shortly before the accident, had a
 motive to flee, and was identified by a witness as the person
 leaving the scene).

 ¶116
 This is nothing new. In criminal trials, actual knowledge is
 often established through circumstantial proof.
Miller, 308 N.W.2d at 7. It should be no different
 in the context of an LTS charge.

 ¶117
 Still, at oral argument, my colleagues and I expressed some
 concern that requiring proof of the mens rea of knowingly
 might render an LTS conviction unfairly difficult to attain.
But that apprehension accompanies any criminal offense that
 demands proof of a culpable mental state. As the court in
 Cahours v. State, 147 So.3d 574, 576 n.2 (Fla. Dist.
 Ct. App. 2014), recognized—echoing
 Miller—"[k]nowledge or intent is seldom
 capable of direct proof, but usually is established from the
 surrounding circumstances." (Quoting Miller,
 308 N.W.2d at 7.) And given the practice in other
 jurisdictions, there is little reason to believe

 that adopting a knowingly mens rea for LTS offenses in
 Colorado would erect an insurmountable barrier for the
 People.[6]

 ¶118
 In sum, Manzo erred by disregarding the Supreme
 Court's mandate to apply the time-honored presumption of
 scienter when construing a criminal statute. The majority now
 repeats that misstep. And the efforts of both in discerning
 the relevant legislative intent fall
 short—Manzo because it relied on
 traffic-offense statutes that, on closer inspection, cut
 against its analysis, and the majority because it places
 weight on legislative and statutory history that is largely
 inconsequential. Giving effect to the age-old presumption of
 scienter and considering the legislature's intent, I
 would conclude that leaving-the-scene offenses must require
 proof that the defendant acted knowingly. Interpreting
 section 42-4-1601(1) in that manner is the only way to avoid
 casting doubt on the statute's constitutionality.

 ¶119
 That's not the end of the analysis, however, because even
 if the majority correctly discerned our legislature's
 intent in enacting section 42-4-1601(1), that statute, so
 construed, cannot withstand constitutional scrutiny under
 Supreme Court precedent. See People v. Rostad, 669
 P.2d 126, 128 (Colo. 1983) (remarking that the Supreme Court
 has long recognized that one of the most enduring

 principles of criminal jurisprudence under the common law is
 that, in general, a person may not be subjected to severe
 punishment unless the act in question is accompanied by a
 culpable mental state reflecting awareness that such conduct
 is prohibited).

 ¶120
 True, the Supreme Court has, on occasion, declined to apply
 the presumption in favor of scienter—and, in turn,
 declined to read a scienter requirement into a criminal
 statute. But the Court has typically done so only when
 interpreting "public welfare" offenses. In
 Manzo, this court concluded that LTS (death) passes
 constitutional muster despite the absence of a mens rea
 requirement because it is a public welfare offense.
Manzo, 144 P.3d at 158. And today, the majority
 reaffirms that conclusion without further scrutiny, content
 merely to say that nothing has changed to warrant reexamining
 its merits. My next stop is thus the public welfare
 exception.

 3.
In Declining to Correct Manzo's
 Misclassification of LTS (Death) as a Public Welfare Offense,
 the Majority Contravenes United States Supreme Court
 Precedent

 ¶121
 By adhering to Manzo, the majority necessarily
 hitches its wagon to a category of offenses known as
 "public welfare" or "regulatory"
 offenses—those as to which the Court has
 "understood Congress to impose a form of strict criminal
 liability through statutes that do not require the defendant
 to know the facts that make his conduct illegal."
Staples, 511 U.S. at 606. In interpreting such
 statutes,

the Court has inferred from the absence of a mens rea that
 Congress didn't intend to require proof of it.
Id.

 ¶122
 As noted, Manzo concluded that LTS (SBI) fell within
 the public welfare exception. 144 P.3d at 558. And the
 majority today goes further still by extending the public
 welfare classification to LTS (death), which has a higher
 felony-level designation and carries a harsher penalty.
See Maj. op. ¶¶ 29, 44. The majority does
 so despite two developments since Manzo: First, our
 legislature has elevated both LTS (SBI) and LTS (death) to
 higher felony levels carrying harsher penalties; and second,
 the Supreme Court has placed increased emphasis on the
 severity of a sentence when determining whether an offense
 qualifies for public welfare status.

 ¶123
This court's conclusion that LTS (SBI) was a public
 welfare offense departed from Supreme Court precedent from
 the moment Manzo was committed to print. With the
 intervening developments, today's decision drifts even
 farther from the Supreme Court's jurisprudence. But I
 cannot put the cart before the horse. I must start from the
 beginning—the Supreme Court's writings on the
 public welfare exception. I focus in particular on the
 lessons of Staples, which are instructive. And
 because Manzo did not so much as mention
 Staples—and the majority embraces
 Manzo wholesale, no questions asked—I explore
 Staples at great length. As I demonstrate,
 Manzo and the majority opinion cannot coexist with
 Staples.

Where Staples took the road toward a presumption of
 scienter, Manzo—and now the
 majority—have taken the opposite road toward dispensing
 with scienter. Those paths do not converge.

 ¶124
The Court in Staples made clear that "public
 welfare offenses have been created by Congress, and
 recognized by [the] Court, in 'limited
 circumstances.'" 511 U.S. at 607 (quoting United
 States v. U.S. Gypsum Co., 438 U.S. 422, 437 (1978)).
Typically, the cases recognizing public welfare offenses have
 involved "statutes that regulate potentially harmful or
 injurious items." Id.; see also United
 States v. Int'l Mins. &Chem. Corp., 402 U.S.
 558, 564-65 (1971) (characterizing some of the public welfare
 cases as involving statutes regulating "dangerous or
 deleterious devices or products or obnoxious waste
 materials"). The Court's rationale in these cases is
 that as long as defendants know that they are "dealing
 with a dangerous device of a character that places [them]
'in responsible relation to a public danger,' [they]
 should be alerted to the probability of strict
 regulation." Staples, 511 U.S. at 607 (quoting
United States v. Dotterweich, 320 U.S. 277, 281
(1943)). In such cases, the Court has assumed that
 "Congress intended to place the burden on the
 defendant[s] to 'ascertain at [their] peril whether
 [their conduct] comes within the inhibition of the
 statute.'" Id. (quoting United States
 v. Balint, 258 U.S. 250, 254 (1922)). The Court,
 therefore, has "essentially . . . relied on the nature
 of the statute and the particular character of the items
 regulated to determine whether

 congressional silence concerning the mental element of the
 offense should be interpreted as dispensing with conventional
 mens rea requirements." Id.

 ¶125
 With that framework in mind, I turn to what was at issue in
 Staples: whether the defendant had fairly been
 convicted under the National Firearms Act for possessing a
 machine gun that had not been properly registered, even
 though the Government was not required to prove that he knew
 the weapon he possessed had the characteristics that brought
 it within the statutory definition of a machine gun and thus
 within the statutory definition of a "firearm."
Id. at 602-03. The Government argued that no such
 proof was necessary because the defendant was charged with a
 public welfare offense. Id. at 606.

 ¶126
 To support its position, the Government invoked
 Balint, 258 U.S. at 254, where the Court held that
 the Narcotic Act of 1914 (the "Act"), which
 criminalized the undocumented sale of certain narcotics,
 "required proof only that the defendant knew that he was
 selling drugs, not that he knew the specific items he had
 sold were 'narcotics' within the ambit of the
 statute." Staples, 511 U.S. at 606. According
 to the Government, the statutory provision under which
 Staples was convicted defined "precisely the sort of
 regulatory offense described in Balint."
Id. at 608. In its view, all guns—whether
 statutory "firearms" or not—were
 "dangerous devices that put gun owners on notice that
 they must determine at their hazard whether their weapons
 come within the scope of the Act." Id.

 ¶127
 The argument didn't stop with Balint. The
 Government next pointed to United States v. Freed,
 401 U.S. 601 (1971), which involved the possession of
 unregistered grenades. Staples, 511 U.S. at 608. The
 defendant in Freed knew that the items he possessed
 were grenades, and the Supreme Court concluded that the
 charging statute did not require proof that the "also
 knew that the grenades were unregistered." Id.
In so doing, the Court suggested that the statute in question
 was "a regulatory measure in the interest of the public
 safety, which may well be premised on the theory that one
 would hardly be surprised to learn that possession of hand
 grenades is not an innocent act." Id. at 609
(quoting Freed, 401 U.S. at 609). Grenades, the
 Court explained, "are highly dangerous offensive
 weapons, no less dangerous than the narcotics involved in . .
 . Balint." Id. (quoting
Freed, 401 U.S. at 609).

 ¶128
The Staples Court was not persuaded. It concluded
 that neither Freed nor Balint carried the
 Government's burden. As relevant here, it spoke as
 follows:

[O]ur analysis in Freed likening the Act to the
 public welfare statute in Balint rested entirely
 on the assumption that the defendant knew that he was
 dealing with hand grenades—that is, that he knew he
 possessed a particularly dangerous type of weapon (one
 within the statutory definition of a "firearm"),
 possession of which was not entirely "innocent" in
 and of itself. The predicate for that analysis is eliminated
 when, as in this case, the very question to be decided is
 whether the defendant must know of the particular
 characteristics that make his weapon a statutory firearm.

Staples, 511 U.S. at 609 (first emphasis added)
(citation omitted).

 ¶129
The Court was unmoved by the Government's insistence that
 guns, no less than grenades, are very dangerous items that
 should alert their owners to the probability of regulation.
Id. at 609-10. Viewing this as too wide a gap to
 bridge, the Court reminded the Government about "the
 particular care" it had taken in the past "to avoid
 construing a statute to dispense with mens rea where
 doing so would 'criminalize a broad range of apparently
 innocent conduct.'" Id. at 610 (quoting
Liparota v. United States, 471 U.S. 419, 426
(1985)). In Liparota, continued the Court, it held
 that the statute under which the defendant was charged
 required proof that he knew his possession of food stamps was
 unauthorized. Staples, 511 U.S. at 610. It
 did so as a matter of common sense—"largely
 because dispensing with such a mens rea requirement
 would have resulted in reading the statute to outlaw a number
 of apparently innocent acts." Id. It's for
 that reason that the Liparota Court concluded that
 "the statute should not be treated as defining a public
 welfare offense"; after all, a "'food stamp can
 hardly be compared to a hand grenade.'"
Staples, 511 U.S. at 610 (quoting Liparota,
 471 U.S. at 433).

 ¶130
 This brought the Court to a central observation that
 distinguished the case before it from Freed and
 Balint. The long tradition of the widespread and
 lawful practice of gun ownership in this country had no
 analogue in the possession of hand grenades in Freed
 or the sale of dangerous drugs in Balint.
Staples,

511 U.S. at 610. Indeed, guns are generally not
 "'deleterious devices or products or obnoxious waste
 materials,' that put their owners on notice that they
 stand 'in responsible relation to a public
 danger.'" Id. at 607 (first quoting
 Int'l Mins. &Chem. Corp., 402 U.S. at 565,
 and then quoting Dotterweich, 320 U.S. at 281).

 ¶131
 Regardless, the Court was unwilling to adopt the
 Government's proposed approach, which would have rendered
 potential dangerousness alone as sufficient to "alert an
 individual to probable regulation and justify treating a
 statute that regulates the dangerous device as dispensing
 with mens rea." Id. at 611. "[T]hat an
 item is 'dangerous,' in some general sense, does not
 necessarily suggest, as the Government seem[ed] to assume,
 that it is not also entirely innocent." Id.

 ¶132
 Nor was the Government's fallback position convincing.
The Government contended that the array of regulations
 concerning guns at the federal, state, and local levels put
 gun owners on notice that they must ascertain the
 characteristics of their weapons and comply with all legal
 requirements. Id. at 611-12. But the Court concluded
 that "regulation in itself is not sufficient to place
 gun ownership in the category of the sale of narcotics in
 Balint." Staples, 511 U.S. at 613.
Even in Liparota, which involved comprehensive
 regulations on food stamps, the Court explained that it
 "did not understand the statute . . . to dispense with a
 mens rea requirement." Staples, 511
 U.S. at 613. At any rate, notwithstanding "the overlay
 of legal restrictions on gun ownership," the Court was
 skeptical that gun

 regulations were "sufficiently intrusive" to
 "impinge upon the common experience that owning a gun is
 usually licit and blameless conduct." Id.

 ¶133
 The concern was not merely conceptual; it was also practical.
The Court had reservations about embracing the
 Government's suggestion "that dangerous and
 regulated items place their owners under an obligation to
 inquire at their peril into compliance with
 regulations." Id. at 614. As an example of
 potential "untoward results," the Court referred
 specifically to automobiles:

Automobiles, for example, might also be termed
 "dangerous" devices and are highly regulated at
 both the state and federal levels. Congress might see fit to
 criminalize the violation of certain regulations concerning
 automobiles, and thus might make it a crime to operate a
 vehicle without a properly functioning emission control
 system. But we probably would hesitate to conclude on the
 basis of silence that Congress intended a prison term to
 apply to a car owner whose vehicle's emissions levels,
 wholly unbeknownst to him, began to exceed legal limits
 between regular inspection dates.

Id.

 ¶134
 The same cautionary theme appeared years before in
 International Minerals & Chemical
 Corp.:

In Balint the Court was dealing with drugs, in Freed with
 hand grenades, in this case with sulfuric and other dangerous
 acids. Pencils, dental floss, paper clips may also be
 regulated. But they may be the type of products which might
 raise substantial due process questions if Congress did not
 require, as in murdock, "mens rea" as to each
 ingredient of the offense. But where, as here and as in
 Balint and Freed, dangerous or deleterious devices or
 products or obnoxious waste materials are involved, the
 probability of regulation is so great that anyone who is
 aware that he is in possession of them or dealing with them
 must be presumed to be aware of the regulation.

402 U.S. at 564-65.

 ¶135
 Significantly, the Court added that the severity of a
 statute's potential penalty has long been a compelling
 consideration in determining whether Congress intended to
 dispense with a mens rea requirement. Staples, 511
 U.S. at 616. Because Staples faced a possible ten-year prison
 term—a penalty the Court regarded as
 "harsh"—this factor reinforced the
 Court's reading of the statute. Id. at 616. Such
 a potential sentence in the state penitentiary stood in stark
 contrast to the light penalties—fines or short jail
 sentences—"almost uniformly" involved in the
 early public welfare cases. Id.

 ¶136
 Commentators, the Court noted, recognize that the lenient
 penalties accompanying public welfare offenses logically
 complement the absence of a mens rea requirement.
Id. "In a system that generally requires a
 'vicious will' to establish a crime, imposing severe
 punishment for offenses that require no mens rea would seem
 incongruous." Id. at 616-17 (quoting 4 William
 Blackstone, Commentaries, *21). In fact, observed the Court,
 some courts have justified the lack of a mens rea based in
 part on the offenses not bearing the same harsh punishments
 as "infamous crimes," and have questioned whether a
 term of imprisonment of any length is compatible with the
 reduced culpability inherent in regulatory offenses.
Id. at 617 (quoting Tenement House Dep't v.
 McDevitt, 109 N.E. 88, 90 (N.Y. 1915)). Continuing, the
 Court added that, like these courts,

 commentators have argued that offenses that are punishable by
 imprisonment should not be considered public welfare offenses
 and should, instead, require proof of a mens rea.
Id.

 ¶137
 But this wasn't all about commentators and other courts.
The Staples Court acknowledged that "[i]n
 rehearsing the characteristics of the public welfare
 offense," it, too, had included in its consideration the
 severity of the punishment and had noted that
 "'penalties commonly are relatively small, and
 conviction does no grave damage to an offender's
 reputation.'" Id. at 617-18 (quoting
Morissette, 342 U.S. at 256).

 ¶138
 Zooming in on the felony designation of Staples's
 conviction sharpened the force of the Court's concern.
After all, explained the Court, "'felony' is, as
 we noted in distinguishing certain common-law crimes from
 public welfare offenses, 'as bad a word as you can give
 to man or thing.'" Id. at 618. (quoting
Morissette, 342 U.S. at 260). Indeed, close
 adherence to the early cases "might suggest that
 punishing a violation as a felony is simply incompatible with
 the theory of the public welfare offense." Id.
Under this view, unless there is a clear statement from
 Congress that it does not intend to require a mens rea,
 courts "should not apply the public welfare offense
 rationale to interpret any statute defining a felony
 offense as dispensing with mens rea." Id.
(emphasis added).

 ¶139
The Court, however, stopped just short of adopting such a
 bright-line rule, in part because it was not necessary to
 decide the case before it. Id. Instead, the Court
 concluded that "[w]here . . . dispensing with mens rea
 would require the defendant to have knowledge only of
 traditionally lawful conduct, a severe penalty is a further
 factor tending to suggest that Congress did not intend to
 eliminate a mens rea requirement." Id. In such
 a case, courts should apply the usual presumption of scienter
 requiring proof that the defendant knew the facts that made
 his conduct illegal. Id. at 619.

 ¶140
 Against this backdrop, Manzo's classification of
 LTS (SBI) as a public welfare offense strains credulity.
Applying Morissette, the court furnished five
 reasons for this determination—none of them persuasive.
Manzo, 144 P.3d at 558. First, the court stated
 that, like public welfare offenses, LTS (SBI) proscribes
 "inaction where the law requires performance of a
 duty." Id. But this is as circular as the
 court's conclusion that it could not infer a legislative
 intent to require a mens rea in section 42-4-1601(1) because
 the statute requires a driver involved in an accident to
 stop. How can a driver be expected to stop without knowledge
 of an accident? Thus, while public welfare offenses
 "typically proscribe 'neglect where the law requires
 care,'" in an LTS case involving a morally blameless
 driver, any such neglect is the result of lack of knowledge
 of the circumstances giving rise to a legal requirement for
 care. Manzo, 144 P.3d at 558 (quoting
Morissette, 342 U.S. at 255).

 ¶141
 Second, the Manzo court indicated that LTS (SBI) was
 analogous to public welfare offenses because rather than
 result in injury to a specific person, it created merely a
 probability of injury. Id. But this is inaccurate.
LTS (SBI) is not a crime that principally endangers the
 general public at large; its most consequential harm is to
 the specific injured person. As pertinent here, the goal of
 section 42-4-1601(1) is to encourage a driver involved in an
 accident resulting in SBI to stop and render aid to the
 injured person. Manzo's view of LTS (SBI) as a
 crime against the general public at large would risk placing
 nearly any offense in that category.

 ¶142
 Third, the Manzo court discerned that the commission
 of LTS (SBI) impairs an important regulatory scheme.
Id. Driving is dangerous, the court declared, and
 "[t]he public safety interest in regulating driving is
 self-evident." Id. (quoting People v.
 Ellison, 14 P.3d 1034, 1039 (Colo. 2000)). But the
 Supreme Court rejected this overly simplistic rationale in
 Staples. Dangerousness alone is insufficient to put
 an individual on notice about probable regulation and justify
 treating a statute that regulates a dangerous item as
 dispensing with a mens rea requirement. Staples, 511
 U.S. at 611. A device may be entirely innocent even though it
 may also be deemed dangerous. Id. Indeed, for
 drivers with no knowledge of involvement in an accident, the
 fact that an automobile may be considered dangerous cannot be
 enough to put them on notice that section 42-4-1601(1)
 regulates automobiles by dispensing with a scienter
 requirement.

 ¶143
 More importantly, the Supreme Court has been careful to avoid
 construing a statute to dispense with a mens rea
 requirement if the result would be the criminalization of a
 wide range of apparently innocent conduct. Staples,
 511 U.S. at 610; Liparota, 471 U.S. at 426. By
 interpreting section 42-4-1601(1) as dispensing with a mens
 rea requirement, Manzo criminalized some apparently
 innocent conduct. Just as the Supreme Court in
 Liparota, 471 U.S. at 419, required proof that the
 defendant knew his possession of the food stamps was
 unauthorized, this court in Manzo should have done
 likewise by requiring proof that a defendant charged with LTS
 (SBI) had knowledge of being involved in an accident. As a
 matter of common sense, this is necessary to avoid outlawing
 a number of apparently innocent acts.

 ¶144
 Nor was the Manzo court's take on regulations
 tenable. Much like dangerousness, regulation, without more,
 is not sufficient. Staples, 511 U.S. at 613. It
 wasn't sufficient in Liparota, despite the
 comprehensive restrictions on food stamps, and it wasn't
 sufficient in Staples, despite the overlay of
 restrictions on gun ownership. Staples, 511 U.S. at
 611. Manzo's analysis essentially mirrored the
 Government's unsuccessful position in
 Staples—"that dangerous and regulated
 items place their owners under an obligation to inquire at
 their peril into compliance with regulations."
Id. at 614. The Staples Court wisely warned
 about

 the unintended consequences of the Government's proposed
 approach—its automobiles example resonates here.

 ¶145
 Fourth, the Manzo court noted that section
 42-4-1601(1) doesn't specify intent as a necessary
 element. But a driver is not "in a position to
 prevent [the violation of section 42-4-1601(1)] with no more
 care than society might reasonably exact from one who assumed
 his responsibilities." Manzo, 144 P.3d at 558
(quoting Morissette, 342 U.S. at 256). Again, a
 driver who has no knowledge of involvement in an accident
 cannot act to avoid a violation of section 42-4-1601(1).

 ¶146
 Fifth, the Manzo court acknowledged that the
 penalties for public welfare offenses are "typically
 relatively small" when compared to penalties for common
 law crimes. 144 P.3d at 558. Without even identifying what
 penalty Manzo faced, the court concluded, nearly in summary
 fashion, that LTS (SBI) "is penalized less severely than
 several typical common law
 crimes."[7] Id. at 559 (emphasis added).
Thus, simply because the penalty for LTS (SBI) was less
 severe than the penalties for a few common law crimes, the
 court counted this factor in favor of classifying LTS (SBI)
 as a public welfare offense. I am aware of no authority that
 supports this proposition. The inquiry is not
 whether the offense is penalized more harshly

 than a few common law crimes; it's whether the offense is
 penalized harshly. This is yet another aspect of the analysis
 in Manzo that cannot be harmonized with
 Staples but that nevertheless receives the
 majority's stamp of approval.

 ¶147
 In a word, Manzo struck out—going zero for
 five under Morissette's framework. Although
 stare decisis ordinarily binds us to our prior decisions, the
 doctrine has exceptions. I address next why an exception is
 justified here.

 4.
Manzo Should Never Have Seen the Light of
 Day—The Time Has Come to Finally Draw the Curtains on
 It

 ¶148
 This is precisely the type of situation that warrants an
 exception to stare decisis—the judge-made doctrine that
 ordinarily requires us to stand by our prior decisions.
See People v. Kembel, 2023 CO 5, ¶ 43, 524 P.3d
 18, 27. Like most rules, stare decisis is not absolute. We
 are bound to a preexisting rule of law "unless we are
 'clearly convinced that the rule was originally erroneous
 or is no longer sound because of changing conditions and that
 more good than harm will come from departing from [that]
 precedent.'" Id. (quoting McShane v.
 Stirling Ranch Prop. Owners Ass'n, 2017 CO 38,
 ¶ 26, 393 P.3d 978, 984).

 ¶149
 For the reasons I have explained, more good than harm will
 unquestionably come from parting ways with Manzo.
And although the doctrine requires only one of the other two
 alternative conditions, both are met. First, as discussed,
 Manzo was defective from its inception. Second,
 evolving circumstances have only

 heightened the need to make an exception to stare decisis.
Having addressed the former in detail, I now turn to the
 latter.

 5.
Recent Developments Compound the Majority's Troubling
 Reliance on Manzo

 ¶150
 The majority's mistake in aligning itself with
 Manzo is exacerbated by (1) the post-Manzo
 elevation of the felony levels and punishment for LTS (SBI)
 and LTS (death), and (2) the Supreme Court's recent
 emphasis on the severity of the punishment as a factor in
 determining whether an offense qualifies for public welfare
 status. I take each development in turn.

 ¶151
 As pertinent here, the General Assembly has amended section
 42-4-1601 on two separate occasions since we decided
 Manzo—in 2008 to change LTS (death) from a
 class 4 to a class 3 felony, and in 2012 to change LTS (SBI)
 from a class 5 to a class 4 felony. See Ch. 225,
 sec. 1, § 42-4-1601(2)(c), 2008 Colo. Sess. Laws 850,
 850 (elevating LTS (death) from a class 4 to a class 3
 felony); Ch. 261, sec. 1, § 42-4-1601(2)(b), 2012 Colo.
 Sess. Laws 1354, 1354 (elevating LTS (SBI) from a class 5 to
 a class 4 felony). As a result, the possible penalty for LTS
 (death) has increased from six to twelve years in prison, and
 the possible penalty for LTS (SBI) has increased from three
 to six years in prison.

 ¶152
 Recall that the Supreme Court in Staples regarded a
 ten-year sentence as harsh. Staples, 511 U.S. at
 616; see also X-Citement Video, Inc., 513 U.S. at 72
(same). LTS (death) carries a possible sentence that is two
 years harsher. And, in light of

 his adjudication as a habitual criminal offender, Brown
 received a sentence that is four times the possible
 twelve-year sentence for LTS (death). Thus, Brown is serving
 a prison term of forty-eight years without any
 requirement of proof of scienter.

 ¶153
 Yet the majority insists there is no constitutional infirmity
 here. I see no way of squaring that conclusion with the
 Supreme Court's analysis in Staples and its
 ancestors.

 ¶154
Staples's progeny is even more pointed. Just
 seven years ago, in Rehaif, the Supreme Court
 reiterated that it "typically decline[s] to apply the
 presumption in favor of scienter in cases involving statutory
 provisions that form part of a 'regulatory' or
 'public welfare' program and carry only minor
 penalties." 588 U.S. at 232 (emphasis added). For
 the first time, in defining a public welfare offense, the
 Court referenced statutory provisions that "carry only
 minor penalties" as a distinct consideration, separate
 and apart from its reference to statutory provisions
 "that form part of a 'regulatory' or 'public
 welfare' program." Id. And the court used
 the conjunctive "and" between the two clauses,
 signaling that both conditions must be met for an
 offense to qualify as a public welfare offense and for a
 court to dispense with the presumption of scienter.
Id. I am not comfortable chalking this up to
 careless or imprecise drafting.

 ¶155
 And, if there was any doubt about what the Court meant in
 that sentence, the very next two sentences paddled it safely
 to clarity:

The firearms provisions before us are not part of a
 regulatory or public welfare program, and they carry a
 potential penalty of 10 years in prison that we have
 previously described as "harsh." Hence,
 this exception to the presumption in favor of
 scienter does not apply.

Id. (emphases added) (citation omitted). I suppose
 it's possible that the Court might have erred in one
 sentence—we're "only human after all."
People v. Crabtree, 2024 CO 40M, ¶ 38, 550 P.3d
 656, 666 (quoting Rag'n'Bone Man, Human, on
 Human (Columbia Records 2017)). But in three consecutive
 sentences? It requires a considerable leap to accept that.
The most reasonable inference from the three quoted sentences
 in Rehaif is that typically where, as here, an
 offense carries a harsh sentence, courts may not dispense
 with the presumption of scienter.

 ¶156
 The majority airbrushes Rehaif into dicta, treating
 some of its binding language as an aesthetic inconvenience.
Maj. op. ¶ 32. According to the majority, the
 Court's relevant comments were of no consequence because
 the statute it was interpreting included a culpable mental
 state and the question raised was whether it applied to all
 the elements of the offense outside of the jurisdictional
 element. Id. But that reading doesn't do
 Rehaif justice. Indeed, the quoted language
 encapsulated the Court's holding on the mens rea issue:
 First, the Court articulated the law on when it may typically
 decline to give effect to the presumption of scienter;
 second, the Court applied that law to the facts; and third,
 the Court explained that applying the law to the facts led to
 the conclusion that the exception to the presumption
 didn't apply. Rehaif, 588 U.S. at 232. It made
 no difference that

the statute in question included a culpable mental state and
 the only issue was whether it applied to all the elements
 minus the jurisdictional one.

 ¶157
 And to the extent the majority pins its hopes on the use of
 the "typically" qualifier in the first of the three
 sentences, it overlooks that there was nothing atypical in
 that case, which is why the Court omitted the qualifier in
 the second and third sentences. Id. It is likewise
 here—there is nothing atypical that would warrant
 departure from the presumption of scienter. And without a
 reason to call this case atypical—Rehaif's
 stern pronouncements on scienter cannot be swept aside.

 ¶158
 Even if Rehaif didn't alter the law by making
 the harshness of the penalty dispositive, it undeniably
 infused that factor with more weight than any precedent to
 date. And giving the harshness of the penalty for LTS (death)
 the forcefulness Rehaif assigned to it, while
 considering the other relevant factors, leads to the
 inescapable conclusion that LTS (death) is not a public
 welfare offense as to which the presumption of scienter is
 inapplicable. To my mind, a class 3 felony carrying a
 possible twelve-year prison sentence no more resembles a
 public welfare offense than a skyscraper resembles a
 bungalow.

 ¶159
 To recap, inconsistent with Supreme Court precedent, the
 majority incorrectly declines to impute a culpable mental
 state to section 42-4-1601(1). Without a mens rea
 requirement, LTS (death) is unconstitutional as violative of

 due process.[8] I would conclude that the statute implies
 the mens rea of knowingly:

A driver charged with LTS (death) must have knowledge of
 involvement in an accident of the type imposing a duty to
 stop. Because the district court failed to instruct the jury
 on any mens rea, it erred. But does that error require
 reversal?

 C.
No Reversal Is Required Because the Error Was
 Constitutionally Harmless

 ¶160
 Brown paused after running over the victims with his front
 tires. He then continued driving down the alley and
 accelerated after running over the victims with his rear
 tires. Multiple people yelled at him to stop. When he was
 told he'd run over two people, he denied it, paused, and
 then immediately drove away.

 ¶161
 Under these circumstances, the error in failing to include
 the culpable mental state of knowingly in the elemental
 instruction for LTS (death) was harmless beyond a reasonable
 doubt. The evidence of Brown's guilt was overwhelming.
See Pettigrew v. People, 2022 CO 2, ¶¶
 54-56, 501 P.3d 813, 825

(concluding that the admission of the evidence obtained from
 the search of the defendant's cell phone was harmless
 beyond a reasonable doubt because the constitutionally
 admissible evidence of guilt was "overwhelming").

 II.
Conclusion

 ¶162
 The time has come, I believe, to take the step the Supreme
 Court seemed tempted to take in Staples: drawing a
 definitive line precluding any felony from being classified
 as a public welfare offense absent a clear statement from the
 legislature that it does not intend to require a mens
 rea.[9]
 Most, if not all, states have habitual-criminal or so-called
 three-strike statutes, and federal law likewise permits
 enhanced sentencing in some circumstances for repeat
 offenders. The problem with allowing a felony to be treated
 as a public welfare offense is that a defendant convicted of
 such an offense could face a sentence three or four times
 longer—if not more—than the maximum baseline
 penalty. Indeed, we have before us a defendant serving
 forty-eight years in prison on a class 3 felony conviction
 even though the People were not required to prove any mens
 rea. In 2026, in the United States of America, no person
 should be exposed to such severe punishment for a felony that
 requires no proof of scienter.

 ¶163
 But that's a call for another day, for another tribunal,
 and perhaps for another case. Here, I write separately
 because I am convinced that the majority errs in its analysis
 of the first issue we agreed to review. However, because that
 error is constitutionally harmless, I concur in the judgment
 only with respect to that portion of the majority opinion. I
 otherwise concur in the majority opinion.

 ¶164
 I cannot join the majority on the first issue because it
 rests on Manzo—a decision that was not only
 wrongly decided but has grown even more untenable in light of
 recent developments—and because I see no way to square
 the majority's analysis with binding Supreme Court
 precedent. The majority's effort to recast the issue as
 merely whether Manzo was overruled by
 Rehaif does not alter this conclusion. Make no
 mistake: The majority decides today that "Manzo
 remains good law." Maj. op. ¶¶ 2, 36,
 40, 44, 59 (emphasis added).

---------

[1] Section 42-4-1601(1) requires
 "the driver of any vehicle directly involved in an
 accident resulting in injury to, serious bodily injury to, or
 death of any person" to "immediately stop such
 vehicle at the scene of such accident or as close to the
 scene as possible or [to] return to the scene of the
 accident." The driver must then remain at the scene to
 fulfill the requirements set forth in section 42-4-1603(1),
 C.R.S. (2025). (Section 42-4-1601 was amended it 2026, but
 because none of the amendments affect the analysis in this
 case, I do not address them.)

[2] I realize that, unlike Florida's
 LTS statute, Colorado's LTS statutory scheme does not
 require a "willful" violation. See §
 42-4-1601. But Dorsett—along with the other
 out-of-state cases discussed here—still underscore a
 reality the majority seems reluctant to accept: Accidents
 can, and do, happen when morally blameless drivers are
 unaware of them.

[3] To be sure, these defendants may have
 been guilty of careless driving and perhaps other traffic
 offenses. But after today, in Colorado, these
 defendants—morally blameless at least with respect to
 LTS—could be convicted of a class 3 or 4 felony and
 sentenced to prison for leaving the scene of an accident they
 were unaware had occurred. This is an important
 distinction—one the majority may be
 overlooking.

[4] The two arguments fall within the
 scope of the first issue we agreed to review: "Whether
 People v. Manzo, 144 P.3d 551 (Colo. 2006), is no
 longer good law or distinguishable, and whether the court
 reversibly erred and violated Brown's due process because
 it allowed the jury to convict him of a class 3 felony for
 leaving the scene of an accident resulting in death without
 the prosecution proving he acted with any culpable mental
 state." (Emphasis added.)

[5] Unlike Minnesota's LTS statute,
 section 42-4-1601(1) does not tether liability to causation.
Instead, it requires only that the defendant was
 "directly involved" in an accident. §
 42-4-1601(1).

[6] Requiring scienter wouldn't mean
 entering a brave new world. For decades before Manzo
 was decided in 2006, our model criminal jury instructions
 included the culpable mental state of knowingly for LTS
 offenses. CJI-Crim. 37:13-37:17 (1983).

[7] At the time, LTS (SBI) was a class 5
 felony carrying a potential sentence of three years in
 prison. See § 42-4-1601(2)(b), C.R.S. (2006);
see also Ch. 261, sec. 1, § 42-4-1601(2)(b),
2012 Colo. Sess. Laws 1354, 1354 (elevating LTS (SBI) from a
 class 5 to a class 4 felony).

[8] The question may arise about the
 constitutionality of traffic offenses that carry severe
 penalties even though the legislature has expressly indicated
 its intent to impose strict liability. Vehicular assault
 (DUI/DWAI) and vehicular homicide (DUI/DWAI) come to mind.
Are these offenses also constitutionally problematic? The
 answer is no. A person who drives under the influence of, or
 impaired by, alcohol and/or drugs has voluntarily and
 consciously consumed an intoxicant and then chosen to get
 behind the wheel of a car. See Rostad, 669 P.2d at
 129. By contrast, a driver who leaves the scene of an
 accident without any knowledge that an accident has occurred
 engages in no voluntary and conscious act—other than
 lawful driving.

[9] As previously explained, in some
 circumstances treating a felony as a public welfare offense
 may raise due process concerns even when the legislature has
 clearly expressed an intent to impose strict liability.
Remember: legislative intent alone cannot insulate a statute
 from due process scrutiny.

---------